JAMES E. MILLS AND MADELINE S. MILLS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mills v. Commissioner
Docket No. 16512-88
United States Tax Court
T.C. Memo 1990-432; 1990 Tax Ct. Memo LEXIS 451; 60 T.C.M. (CCH) 500; T.C.M. (RIA) 90432; August 13, 1990, Filed Decision will be entered for the respondent. Daniel C. Perri, for the petitioners. Linda J. Wise, Thomas Alan Friday, and Shuford A. Tucker, *452 Jr., for the respondent. SCOTT, Judge. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in petitioners' income tax for the calendar year 1984 in the amount of $ 46,902 and additions to tax under sections 6653(a)(1) and (2) and 6661 in the respective amounts of $ 2,345, 50 percent of the amount of interest due on $ 46,902, and $ 11,726. [1]
Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision: (1) whether an Arabian horse farm activity engaged in by petitioners was an activity not engaged in for profit within the meaning of section 183; (2) whether petitioners are liable for the additions to tax for negligence under section 6653(a)(1) and (2); and (3) whether petitioners are liable for the *453 addition to tax for a substantial understatement of tax under section 6661. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Fort Walton Beach, Florida, at the time of the filing of the petition in this case, filed a joint Federal income tax return for the year 1984 with the Internal Revenue Service Center, Atlanta, Georgia. James E. Mills (Dr. Mills) is an obstetrician and gynecologist. From 1969 to 1974, he was the resident instructor in the OB-GYN program at the Scott and White Clinic in Temple, Texas. Dr. Mills and his family resided in Temple, Texas, at that time. In 1974, Dr. Mills accepted a position with the White-Wilson Medical Center in Fort Walton Beach, Florida, and moved his family to Fort Walton Beach, Florida. In October 1972, petitioners purchased an Arabian filly for $ 1,000 as a gift to their daughter. At that time, petitioners' daughter was interested in horses, but she lost her interest. However, petitioners became interested in Arabian horses after purchasing the horse for their daughter and, in October 1973, purchased two more Arabian fillies for a total cost of $ 2,000. *454 In December 1973, petitioners purchased an Arabian stallion, Kaliramie (Kali) for $ 2,500. When petitioners moved from Temple, Texas to Fort Walton Beach, Florida, these four horses were moved with them. Fort Walton Beach has zoning ordinances restricting the area where horses can be kept. However, there is a provision permitting the keeping of horses in an area where horses have been continuously kept prior to the inauguration of the zoning ordinances. On May 31, 1974, petitioners purchased property at 806 Wagonwheel Road. This property consisted of an acre and one-half and, in addition to the house on the property, was improved with a barn with four stalls for horses, a tack room, and a feed room. The property was zoned residential suburban single, but under the grandfather clause to the zoning ordinances, horses were permitted to be kept there. Wagonwheel Road is a private drive with only three lots on it. It is located off of Mooney Road. One of the lots on Wagonwheel was located between petitioners' property at 806 and the bay. On July 1, 1978, petitioners purchased the waterfront lot which was designated 812 Wagonwheel Road and later built a house on that lot where *455 they have lived since sometime in 1985. On August 1, 1975, petitioners purchased a 40-acre farm in Baker, Florida for $ 44,650. This farm was located approximately a 45-minute drive from where petitioners lived. On July 18, 1978, petitioners sold the farm in Baker, Florida for $ 64,000 and moved the horses from the farm to their residence at 806 Wagonwheel Road on a temporary basis. On July 2, 1979, petitioners filed Articles of Incorporation for White Sands Arabians, Inc. Petitioners were listed as the directors. Dr. Mills was listed as president and Mrs. Mills as secretary-treasurer. Dr. Mills purchased 100 shares of stock in the corporation at $ 1 per share and Mrs. Mills purchased 10 shares at $ 1 per share. The corporation, White Sands Arabians, Inc. (White Sands), elected to be a subchapter S corporation. On December 26, 1979, White Sands purchased property consisting of approximately 4.6 acres for $ 18,500 and on February 4, 1980, Dr. Mills purchased additional acreage adjacent thereto for a total of $ 44,550. On June 10, 1983, White Sands purchased lot 10 adjoining the properties which Dr. Mills had acquired on February 4, 1980, for $ 27,500. The entire group of *456 properties consisted of approximately 10.5 acres. These properties were located in an area zoned residential general development, but under the zoning regulations commercial stables and riding academies were permitted as special uses on these properties. White Sands ran a horse boarding and training facility, whereas petitioners continued to own, breed, show, and sell Arabian horses as a personal farm activity. The boarding of horses was put in a corporation by petitioners on the advice of their lawyer and accountant because of the potential liability connected with boarding horses. The 10.5-acre farm, which was in an area referred to as Wright not far from the area in which petitioners lived, was in poor shape at the time of its purchase. There was a barn with 22 stalls on the property, but the barn and stalls were in rundown condition. There was a large sandpit on the property which consumed between 1.5 and 3 acres of the property and caused that part of the property to, in effect, not be useable. Petitioners had hoped at sometime to fill this sandpit and perhaps make some kind of riding ring on it. The property was not fenced at the time it was purchased by White Sands and *457 Dr. Mills, and needed to be fenced to be used for boarding and training horses. Dr. Mills personally worked with some hired employees on clearing and fencing the land, renovating the barn and stalls, and building 12 new stalls. After acquiring the 10.5 acres and moving their horses there, petitioners hired additional employees to assist in the operation of the facility. Since the property was acquired by White Sands it has been well maintained. The following schedule shows the horses owned by petitioners from 1979 through March 12, 1989, together with the date each horse was acquired, in some instances the cost of the horse when it was purchased, the mare and stallion from which the horse came, whether the horse was home bred, and the date and amount received when the horse was sold as shown in the record kept by petitioners: Purchase
Mare & stallion
Where bred
Sold
1. Kaliramie
12-31-73
Ramie
Richard & Kathryn Haines
$ 2,500
Kal-Raffirena
Temple, TX
2. Twimera
5-23-72
Mernow
Ray & Mary Lou Bucklin
$ 1,000
Twink
Selby, SD
3. Gasarahdlafa
Oct-73
Gasrola
Ray & Mary Lou Bucklin
3-9-74  $ 1,000
Farahalafa
Selby, SD
$ 7,500 4. Star Ranoc
Oct-73
Starrings Rage
Ray & Mary Lou Bucklin
2-7-82  $ 1,000
Seynoc
Selby, SD
$ 3,000 5. Gems Raffha
4-25-78
Dairon
James & Martha Shepperd
(sic)  4-3-71  $ 2,500
Rhymafar
Ponce de Leon, FL
$ 3,000 6. Raffhas DNA Fera
4-25-78
Mon Baysham
pkg with dam
4-12-79 Gems Raffha
$ 3,500 7. Kalanoc
4-9-77
Kaliramie
home bred
5-20-83 Star Ranoc
$ 2,000 8. Kalmir
4-28-77
Kaliramie
home bred
4-16-8  Twimera
$ 2,500 9. Ja Kalinna
6-10-77
Kaliramie
home bred
8-29-81 Halzadonna
$ 2,500 10. Kalsara
3-20-78
Kaliramie
home bred
10-21-8 Gasarahalafa
(trade) $ 5,000 11. Kaliraf
6-10-78
Kaliramie
home bred
Gems Raffha
12. Komer
6-28-78
Komsul outside stud
Twimera
home bred
13. Kalara
2-25-79
Kaliramie
home bred
7-13-81 Gasarahalafa
$ 2,000 14. Kalranoc
4-9-79
Kaliramie
home bred
Star Ranoc
15. Kaligha
5-15-79
Kaliramie
home bred
11-17-8 Gems Raffha
$ 4,000 16. Komsulera
6-8-79
Komsul outside stud auction 8-21-82 Twimera
home bred
100 com. $ 1,000 17. Comar Zepazraff
7-5-80
Azraff
Carl & D.H. Huprich
11-12-8 $ 19,000
R-Zepa
Robertsdale, AL
$ 6,000 18. Kalramoc
3-24-80
Kaliramie
home bred
7-8-83  Star Ranoc
$ 1,500 19. Kaligema
4-26-80
Kaliramie
home bred
7-13-8  Gems Raffha
$ 1,250 20. Gems Farous
10-28-80
Raffibn
James & M. Shepherd
10-2-8  $ 1,600
Rhymafara
Ponce de Leon, FL
$ 4,000 21. Meramie
1-19-81
Ramie outside stud 6-1-8  Twimera
home bred
$ 1,500 22. WS Forrests Folly
1-21-81
Kalmir
home bred
10-4-85 Gasarahalafa
$ 2,000 23. WSA Miraffha
4-12-81
Kalmir
home bred
6-19-82 Gems Raffha
$ 4,000 24. TF Zarifa
10-81
Silver King
Jim & Dee Clifton
5-9-83  $ 3,000
Zudeira
Greybull, WY
$ 2,000 25. TF Laila Gamira
10-81
Gamuzon
Jim & D. Clifton
$ 2,500
Rani Arlene
Greybull, WY
26. WS Cupid
1-10-82
Comar Zepazraff
home bred
11-27-8 Star Ranoc
$ 900 27. WS Questionaire
1-18-82
Comar Zepazraff
home bred
6-19-82 Twimera
$ 2,000 28. AM Chatterbox
1-5-82
Fabulous Count
Bozy Tonkershy
died    $ 17,500
Almarah Malkin
Tucson, AZ
6-24-86 29. WS Treasure Chest
2-21-82
Almarah Count's Pennant 3-9-83  AM Chatterbox
Acquired mare in foal
$ 5,000 30. WS Sassie Lassie
1-29-82
Comar Zepazraff
home bred
8-20-83 Gasarahalafa
$ 800   31. Royal Flame
1982
Dixie Fireflash
Billy Saucer
12-14-83
$ 8,000
Alexandrea
Susan James - AL
$ 8,000 32. Kil-A-Mette
1982
Al Marah Tuffy
Mark Miller
$ 6,500
* Blue Millet
Micanopy, FL
33. Shalimar Julie
11-82
Monee
C & M Gonzalez
7-27-8  $ 7,500
Shalimar Tanya
Corpus Christi, TX
$ 3,000 34. WS Sllim Semaj
2-1-83
Kaliramie
home bred
9-24-8  TF Laila Gamira
$ 1,500 35. WS Music Box
2-1-83
Kaliramie
home bred
3-20-8  AM Chatterbox
$ 800   36. WS Jule Halim
4-14-83
Chango Halim
2-7-86  Shalimar Julie
acquired mare in foal
$ 1,000 37. WS Beau-Mette
4-20-83
Beau Triamphe
9-16-86 Kil-A-Mette
acquired mare in foal
$ 2,500 38. WS Royal Knite
6-12-83
Kaliramie
home bred
Royal Flame
39. WS Kalisa
2-5-84
Kaliramie
home bred
7-20-88 Gasarahalafa
$ 2,500 40. WS Sabox
2-17-84
EW Sabask outside stud $ 1,500 9-4-87  AM Chatterbox
home bred
$ 1,500 41. WS Galadinn
2-18-84
Nnidala outside stud 7-5-87  TF Laila Gamira
home bred
$ 300   42. WS Kalimette
3-24-84
Kaliramie
Kil-A-Mette
home bred
43. WS Jubilee
5-11-84
Kaliramie
1-1-86  Shalimar Julie
home bred
$ 500   44. WS Royal Gem
6-17-84
Kaliramie
Royal Flame
home bred
45. OH Kali-Ko
11-16-84
Komer
Phil & Pat Lewis
12-21-88
$ 1,750
Kaligha
Crestview, FL
$ 1,000 46. WS Cavanna
2-29-84
The Covenant
home bred
7-5-8   outside stud
Suzanna Saheer leased mare $ 300
47. WS Katira
3-1-84
Kaliramie
home bred
Twimera
48. WS Bondit
2-2-85
The Covenant outside stud $ 550 5-1-8   Mon Petit
home bred
$ 1,200 Desire-leased
mare
49. White Sands Padron
1-30-85 Ceres Padron outside stud $ 750 3-2-8   TF Laila Gamira
home bred
$ 1,000 50. WS Merisa
2-6-85
EW Sabask outside stud $ 1,500
Twimera
home bred
51. WS Krystal Box
2-  -85
Kaliramie
home bred
6-20-8  AM Chatterbox
52. WS Ramar
2-16-85
Comar Zepazraff
home bred
donated to U of F
Kalranoc
vet school       53. WS Sonata
3-25-85
Komer
home bred
Kil-A-Mette
54. RF Prelude
1985
Sur Jubi
Jane Hall
RF Celeste
mare & foal to satisfy debt of 1141.19 55. WS Luke
6-8-85
Kaliramie
acquired with mare
7-6-8   RF Prelude
$ 750 56. Escourt
Oct. 85
JA Magnificat
Country Lanes Arabs
returned 1986
$ 20,000
GMA Miss Tahiti
Pleasant Hill, OR
or traded for
Shadow Dance
57. WS Komira
2-6-86
Komer
home bred
TF Laila Gamira
58. WS Kallany
2-8-86
HMP Hallony outside stud 3-12-8  Kalranoc
home bred
$ 2,800 59. WS Hope Chest
3-20-86
Kaliramie
home bred
$ 500   AM Chatterbox
60. WS Tika
3-23-86
* SA-IKA outside stud $ 1,000
Kil-A-Mette
home bred
61. WS Maika
5-11-85[sic]
* SA-IKA outside stud $ 1,500 12-15-8 Shalimar Julie
home bred
$ 750   62. WS High Seas
6-5-86
High Country outside stud
Shalimar Julie
home bred
63. WS High Note
4-4-87
High Country outside stud
RF Prelude
home bred
64. Shadow Dance
2-2-85[sic]
JA Magnificat
Country Lane Arabs
as of 86 [sic]
Pleasant Hill, OR
$ 30,000
Sarafayn
65. WS Rain Dance
2-20-80
Shadow Dance
home bred
[sic]
Twimera
66. WS Starlite Dance
4-19-88
Shadow Dance
home bred
Kil-A-Mette
67. WS Moon Dance
5-2-88
Shadow Dance
home bred
Kalranoc
68. WS Prima Dona
5-8-88
Shadow Dance
home bred
RF Prelude
69. WS Fire Shadow
3-12-89
Shadow Dance
home bred
WS Kalimette
*458 indicates the last digit of this date is not legible. During 1981, 1982, and 1983, petitioners had several experts look at their breeding herd and advise them on how they might improve their breeding operation. Because of the advice received from these experts, petitioners acquired the brood mares Chatterbox and Shalimar Julie. Also, petitioners were advised by certain experts to breed some of their mares to stallions other than the ones they owned, since most of their mares had been bred to Kali. The foals noted above as outside bred came from this breeding of mares to stallions at other farms. Because of the advice of one of the experts petitioners consulted, they acquired a new stallion, Escourt. This horse was from top breeding lines. He was a yearling when he was acquired by petitioners in October 1985, but was guaranteed to be fertile. Petitioners sent Escourt to Reddick, Florida, for training and to be bred to two of their mares which they sent along. None of the mares to which Escourt was bred produced foals and examination by a veterinarian disclosed that Escourt was sterile. Since the purchase agreement petitioners had on Escourt assured his fertility, he was *459 returned to the farm in Oregon from which petitioners had purchased him and, in exchange for Escourt and $ 10,000, petitioners acquired Shadow Dance which had the same sire as Escourt. Petitioners have four employees working on the farm; two are full-time and two are part-time. Petitioners attempt to meet once a week with these employees. The employees are covered by workmen's compensation insurance and all employment tax payments are timely withheld and remitted by petitioners to the Internal Revenue Service. A farrier lives on petitioners' farm in a trailer for which he pays $ 250 a month rent. The farrier is self-employed and performs services for petitioners' horses as well as other horses in the area. Petitioners pay the utilities for the trailer in which the farrier lives since when he was first living there at times he failed to pay his bills and the utilities would be cut off. Otherwise, payments made to the farrier by petitioners are for specific services rendered. Petitioners were charter members of the Dixie Gulf Arabian Horse Association. This association was formed to promote Arabian horses in the Gulf Coast area. The association sponsors an Arabian horse show *460 which has been run at times by petitioners. Mrs. Mills has often been in charge of the show and working on the show takes a substantial amount of her time. The Dixie Gulf Arabian Horse Show has at times been held at White Sands Arabian Farms. Mrs. Mills has been president of the Dixie Gulf Arabian Horse Association for 2 years and has been a delegate for 4 years. She has also been a delegate to the National Convention for the Dixie Gulf Arabian Horse Association for the last 5 years. The association includes the states of Alabama, Mississippi, and Northwest Florida. Petitioners have ridden horses in parades and derive a great deal of pleasure from Arabian horses. Recently Mrs. Mills has not ridden because of a back problem. In 1984 she had two operations for her back problem and had one operation in New York for this problem in 1985. Dr. Mills is a member of the mounted posse. He enjoys competitive trail riding. White Sands paid dues to Southern Sportsman, Inc., which is a private hunting organization near Livingston, Alabama, where Dr. Mills hunts on occasions. Dr. Mills served as president of the local symphony for 3 years. In 1983 and 1984, he sponsored an elaborate *461 benefit for the symphony at the White Sands farm. It was a formal affair called "Night with Scheherazade." The entire barn was covered like a tent. Mrs. Mills spent a great deal of time working on this benefit. The most expensive mare that petitioners bought was named Chatterbox. They paid $ 17,500 for Chatterbox. Martha Cromartie, who was the trainer at White Sands at the time petitioners purchased Chatterbox, had trained Chatterbox at Almira Arabians in Tucson, Arizona. The mare was brought out from Arizona with Martha Cromartie so that she would have a horse with which she was familiar when she became trainer at White Sands. Petitioners hoped that Martha would show Chatterbox well and attract clients for their horses. While in foal, Chatterbox foundered on all four hooves. This happened after Martha rode her on a 25-mile trail ride. Founder is a condition in which the hooves separate from the bony part of the foot. The hooves actually fall off. After all four hooves foundered, petitioners made extraordinary efforts to keep Chatterbox alive for 3 years. Artificial hooves were made by orthopedic appliance makers out of aluminum. Dr. Mills was quoted by a local newspaper *462 as stating, with respect to the efforts to save Chatterbox, "Our decision was made by the horse. We didn't want her to suffer. But, she has so much heart." Chatterbox was insured for $ 10,000 prior to foundering. After foundering, another underwriter had to be found. At death, Chatterbox was insured for $ 7,500. Petitioners spent over $ 15,000 in an effort to save Chatterbox. Petitioners were of the opinion that their decision to save Chatterbox was good for the horse industry. Chatterbox also produced two foals after she had foundered. Petitioners recognized that spending over $ 15,000 to keep Chatterbox alive was a poor business decision. Petitioners had another horse that was kicked and a shoulder was broken in 13 places. Petitioners built a sling and nursed her for 4 or 5 weeks. Petitioners made great efforts to maintain White Sands as a presentable place. Fly control is maintained by daily spreading the manure. White Sands' truck is described as immaculate. Dr. Mills has served on the board of directors and on various committees of the Dixie Gulf Arabian Horse Association. He has been the past president of the Northwest Florida Horse Association. Petitioners subscribe *463 to and read several trade journals and horse magazines and attempt to keep themselves well informed as to developments regarding Arabian horses, genetics, breeding, care, and operation of an Arabian horse farm. Dr. Mills works at the Medical Center from 7:00 a.m. at times and at other times from 8:30 a.m. until 5:00 or 6:00 p.m. 4 days a week. He works a half day on Wednesday and in 1984 was on night call every fourth night. Dr. Mills travels to Destin, Florida, twice a month for duties at the satellite clinic of his Medical Center. For the past several years Dr. Mills has played racquetball on Wednesday afternoons from 4:00 p.m. to around 6:30 p.m. Dr. Mills does some work at White Sands on the weekends and on some weekdays after he finishes his work at the Medical Center. Petitioners bought an office building from Voltech School for $ 12,000 and had it transported to White Sands farm where it is now located. It is used as the office on the farm and all the records of the Arabian horse farm activity are maintained in this office. Mrs. Mills maintains the records for the Arabian horse activity and for the White Sands corporation. She supervises the employees, handles sales, *464 talks with customers, and performs other services. Mrs. Mills has a contract to purchase wood chips which are hauled into the farm area in a semi-truck. These chips are used for stall dressings and when petitioners purchase excess chips they are sold to others. The following schedule shows the stud fees as reported on Schedule F of petitioners' personal Federal income tax return for each of the years indicated: Year
Stud Fees
1981
$    -0-
1982
-0-
1983
-0-
1984
500.00
1985
800.00
1986
-0-
1987
-0-
The Arabian horse market was at its peak in 1984 and has been declining since. The following schedule shows the income, farm expenses, depreciation, and net losses reported on Schedule F of petitioners' personal Federal income tax returns for each of the years indicated: Farm
Year
Income
Expenses
Depreciation
Net Loss
1981
$ 700.00
$ 55,439.92
$  7,914.00
($  62,653.92)
1982
-0-
77,989.87
13,249.46
(   91,239.33)
1983
475.00
89,593.00
14,081.00
(  103,199.00)
1984
784.00
96,543.00
13,570.00
(  109,329.00)
1985
800.00
71,110.00
15,970.00
(   86,280.00)
1986
37.00
88,670.00
11,551.00
(  100,184.00)
1987
425.00
78,647.00
14,566.00
(   92,788.00)
*465 The income reported on petitioners' Schedule F did not include the receipts or gain from the sale of horses which petitioners reported on Forms 6252, 4797, or Schedule D, of their respective returns. The following schedule shows the gain reported by petitioners from the sale of horses for the years indicated: Year
Gain from Sale of Horses
1981
$  8,041.55  1982
11,750.00  1983
14,500.00  1984
7,500.00  1985
3,666.00  1986
9,075.00 *
1987
7,600.00  The following schedule shows the net loss resulting from combining petitioners' income reported from the farm activity with the gain on the sale of horses and subtracting claimed expenses including depreciation: Year
Income
Expenses
Net Loss
1981
$  8,741.55
$  63,354.44
($  54,612.89)
1982
11,750.00
91,239.35
(   79,489.35)
1983
14,975.00
103,674.00
(   88,699.00)
1984
8,284.00
110,113.00
(  101,829.00)
1985
4,466.00
87,080.00
(   82,614.00)
1986
9,112.00
100,221.00
(   91,109.00)
1987
8,025.00
93,213.00
(   85,188.00)
*466 White Sands reports the income from the boarding of horses. The charge for boarding a horse which is fed twice a day is $ 120 a month and if the service of cleaning the stall is rendered, the charge is $ 155 a month. Employees of White Sands feed all the horses at the same time because horses are sensitive to other horses being fed. The horses at White Sands are fed regularly at 8:00 a.m. and 4:30 p.m. White Sands will not allow boarders to feed their own horses. Strict rules are maintained for boarders. Petitioners pay a boarding fee to White Sands for the boarding of their horses. White Sands operates on a fiscal year basis ending June 30. The following schedule shows the amount of boarding fees paid by petitioners to White Sands in the fiscal years 1982, 1983, 1985, and 1986 and White Sands total income in those years: Boarding fee paid
Year
by petitioners
White Sands Income
6/30/82
$ 58,214.00
$ 72,899.00
6/30/83
60,255.00
77,318.00
6/30/85
53,550.00
79,433.00
6/30/86
51,750.00
94,204.00
White Sands on its Form 1120S reported the following amounts of income and net loss for the years shown: Year
Income
Net Loss
6/30/80
$ 17,295.00
($  9,822.00)
6/30/81
44,061.00
(  20,252.00)
6/30/82
72,697.84
(  11,496.11)
6/30/83
77,317.72
(  21,510.44)
6/30/84
88,968.00
(  21,981.00)
6/30/85
79,435.00
(  29,084.00)
6/30/86
94,284.00
(  16,591.00)
6/30/87
96,462.00
(  26,290.00)
*467 Petitioners pay White Sands the amount it needs to keep its operation going as rent and fees for boarding their horses. The amount petitioners pay for boarding their horses at White Sands is judged on the basis of the amount White Sands needs to cover expenses. Mrs. Mills keeps the books and records for White Sands and for petitioners' horse breeding activity. The records of the pedigree of the horses are well kept and the farm income records are kept in a reasonably accurate manner. A separate bank account is maintained for White Sands and Mrs. Mills attempts to pay from that bank account expenses she considers are expenses of White Sands. She pays expenses she considers expenses of petitioners' horse breeding activity from the personal account that petitioners maintain. However, this segregation is not strictly followed and at times payments are made from the wrong account. Mrs. Mills is active in the Medical Auxiliary and is a member of the Stitchery. She also participates in other charitable activities in the Fort Walton Beach area and has during the year here involved and other years been active in her charitable work. The following schedule shows the amounts reported *468 by petitioners on their Federal income tax return as wages, salaries, etc., received by Dr. Mills from his medical practice: Year
Wages, salaries, tips, etc.
1981
$ 171,754.95
1982
159,838.70
1983
215,261.00
1984
231,133.00
1985
194,492.00
1986
225,000.00
1987
428,630.00
A number of various types of horse farms have been operated in the general vicinity of White Sands farm. At one time this area was rural. However, at the time of the trial of this case in April 1989, the area had come under development and some of the properties which had been operated as horse farms had been sold and developments were being placed on the property. There is construction of buildings of a branch of the University of North Florida being placed on property close to the White Sands farm. Also, a new four-lane highway is being placed in the general area. Due to the changes in the nature of the area surrounding the White Sands farm and other factors, the value of the property has increased and at the date of the trial of this case in April 1989, the value of the farm operated by White Sands was approximately $ 340,000. Petitioners on their 1984 *469 Federal income tax return claimed a loss deduction of $ 109,329. The loss was shown on Schedule F of their return as arising from the breeding of Arabian horses. Petitioners on their 1984 return also claimed a flow-through loss from White Sands Arabians, Inc., in the amount of $ 21,981. Respondent in his notice of deficiency disallowed $ 107,133 of the loss claimed by petitioners from their Arabian horse activity. The amount disallowed was computed by allowing the interest deduction claimed which was offset by the income reported. Respondent explained that it was determined that the farm activity was an activity not engaged in for profit and that any expenses paid or incurred were not for the purpose stated or were not ordinary and necessary and that, therefore, deduction of expenses is limited to the amount of income produced with the exception of interest, which deduction is allowable in full. Respondent in his notice of deficiency disallowed the entire $ 21,981 flow-through loss claimed from White Sands Arabian, Inc., with the explanation that White Sands Arabian, Inc., is not an activity engaged in for profit and that any expenses paid or incurred were not for the purpose *470 stated or were not ordinary and necessary, and, therefore, any expense deduction is limited to the amount of the income produced with the exception of interest and taxes, which deductions are allowable in full. Respondent also determined additions to tax under section 6653(a)(1) and (2) for negligence and under section 6661 for substantial understatement. OPINION Section 183 provides that if an individual or subchapter S corporation is engaged in an activity which is not engaged in for profit, no deduction attributable to such activity shall be allowed except as provided in that section. Section 183(c) defines an activity not engaged in for profit as any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraphs (1) or (2) of section 212. Deductions are allowable under section 162 or under paragraphs (1) or (2) of section 212 only where the taxpayer is engaged in an activity with the actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion *471 702 F.2d 1205 (D.C. Cir. 1983); Allen v. Commissioner, 72 T.C. 28 (1979). A taxpayer's expectation of profit need not be a reasonable expectation, but the facts and circumstances must indicate that the activity was entered into or continued with an honest objective of making a profit. Dreicer v. Commissioner, supra. Whether the required objective of making a profit exists is a question of fact to be resolved on the basis of all the facts and circumstances of the particular case. Dunn v. Commissioner, 70 T.C. 715 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Section 1.183-2(b), Income Tax Regs., lists some of the factors to be considered in determining whether an activity is engaged in for profit. The factors listed include: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate *472 in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No one factor is conclusive and all factors are to be weighed in determining a taxpayer's true objective. Dunn v. Commissioner, 70 T.C. at 720; sec. 1.183-2(b), Income Tax Regs. Greater weight is to be given to objective facts than to a taxpayer's mere statement of his intent. Churchman v. Commissioner, 68 T.C. 696 (1977); sec. 1.183-2(a), Income Tax Regs.
Considering all the facts in this case, we conclude that petitioners did not have an honest objective of making a profit. Petitioners did not carry on their Arabian horse activity in a truly businesslike manner. They became attached to the horses they had and in several cases expended amounts in excess of any value the horse might ultimately have to save a horse with some difficulty. Chatterbox *473 was a prime example. Also, petitioners' attachment to their horse Kali caused them to keep breeding him to mares after it should have become apparent that better results would be obtained by breeding the mares to other stallions. Petitioners did later breed some mares to outside stallions and later even bought another stallion, but they did continue using Kali after good business judgment would have indicated otherwise. There are numerous indications in the record that petitioners' interest was more in developing a particular type of Arabian horse than in the money that might be made from the activity. Petitioners initially had no expertise with respect to Arabian horses, but did through the years develop some, and did seek advice from people in the area. Petitioners spent a reasonable amount of time in carrying on the activity, but the time they spent was more commensurate with a recreational and general interest than an attempt to make money from the activity. There is no indication in the record that petitioners' horses were increasing in value. Rather, the record shows that the value of the horses was decreasing. The land used by the subchapter S corporation did increase *474 in value from the time it was acquired to the time of the trial of this case, but it certainly could not have been a great influence on petitioners' continuing the activity since the increase in the value of the land was far too little to offset the large losses petitioners had sustained. There is no showing that petitioners ever carried on any similar activity. The other activities of Mrs. Mills were dealing with charitable and volunteer organizations and Dr. Mills' major activity was being a physician. The history of petitioners' activities with Arabian horses going back to the early 1970's was one of continuous losses. Petitioners state that in one year when they sold the Baker farm, they did have a profit. However, there is nothing in the record to show that petitioners had a profit on their whole Arabian horse activity in the year the farm was sold. The Baker farm was sold for approximately $ 20,000 more than petitioners paid for it. Unless some profit resulted in the year the Baker farm was sold, which the record does not show, there were no years of occasional profits involved here. Dr. Mills had a very substantial income from his practice of medicine and, in fact, *475 it is clear that this substantial income enabled petitioners to pursue their interest in Arabian horses. Clearly here there were many elements of personal pleasure. Both petitioners have been quoted in various newspaper articles with respect to their interest in Arabian horses and their interest clearly manifested itself in the horse shows and other similar activities in which they engaged. Their lack of a businesslike attitude towards the horses, such as the drastic efforts to save Chatterbox and other activities with respect to some of the horses, also is indicative of the personal pleasure and recreation involved for petitioners in the Arabian horse activity. It is clear from this record that most of petitioners' activities in connection with the Arabian horses were for their personal pleasure and recreation rather than business activities. Moving the horses from the Baker farm which was much larger and a much better place to keep the horses to a smaller place near their home certainly was not conducive to making a profit from the horse operation. Rather, it was for the purpose of having the horses much nearer to where petitioners lived. Also, the history of the cost of the *476 horses purchased or the cost of the horses bred as compared to the prices received for the horses, even in the very best years, must have made it clear to petitioners that no profit was to be made from the operation the way they were running it. Also, the relationship between petitioners' personal activity of breeding horses and the boarding operation of the subchapter S corporation was not businesslike. In fact, the amounts paid by petitioners to the subchapter S corporation for boarding their horses were based on what was needed by the corporation to defray its immediate operating expenses. Had petitioners been serious about making a profit, they might have done better at times to have boarded their horses at an unrelated facility. Some of petitioners' bookkeeping was unbusinesslike. Even more important is the fact that petitioners apparently never reviewed the records they kept to determine where expenses might be cut or how income might be increased or to evaluate the performance of the operation. A lack of use of records for such purposes indicates a lack of profit objective. *477 Golanty v. Commissioner, 72 T.C. 411, 430 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Another indication of lack of profit objective is the small amount of advertising done by petitioners. Had petitioners really been interested in increasing their stud fees and increasing their sales of horses, they would have certainly advertised more extensively. A review of petitioners' purchases and sales of horses is also indicative of a lack of profit objective. The highest price the record shows that petitioners received for a horse was $ 8,000 received by petitioners in December of 1983 for a horse named Royal Flame. However, the record shows that petitioners had paid $ 8,000 for that horse in June 1982. The same is true for a number of other horses purchased and sold by petitioners. Considering the record here as a whole, we conclude that petitioners were not engaged in either the horse breeding activity as reported on Schedule F of their personal return or the horse boarding activity reported by their subchapter S corporation with the objective of making a profit. Petitioners argue that even if we conclude that their activity *478 with respect to Arabian horses was not an activity engaged in for profit, respondent erred in determining the additions to tax for negligence and substantial understatement of tax. Petitioners take the position that there was enough basis for their claim of deduction of farm losses so that it was not negligent or in disregard of rules and regulations for them to claim such losses on their return for 1984. On this basis, they argue that they should not be subject to the addition to tax under section 6653(a)(1) and (2). Section 6653(a)(1) provides for an addition to tax of 5 percent of the underpayment, if any part of the underpayment is due to negligence or intentional disregard of rules and regulations. Since the addition to tax was determined in the notice of deficiency, petitioners have the burden of proof with respect to this issue. Enoch v. Commissioner, 57 T.C. 781 (1972). At the trial, the parties stipulated that if the Court determined that petitioners were engaged in the Arabian horse activity for a profit, they were entitled to deduct 70 percent of the deductions *479 claimed, other than interest, and the entire interest deduction claimed. This stipulation disposed of the issue raised with respect to petitioners' substantiation of deductions and proof that the claimed deductions were, in fact, expenses of the Arabian horse activity. However, petitioners have offered no explanation of the reason for excessive deductions even on their view of the profit objective of the Arabian horse activity. On this basis alone, the record supports respondent's determination of the addition to tax under section 6653(a)(1). Section 6653(a)(2) provides for an addition to tax in an amount equal to 50 percent of the interest payable with respect to the portion of the underpayment due to negligence or intentional disregard of rules or regulations. Therefore, it is necessary to determine whether only the portion of the underpayment due to the overstatement of deductions is due to negligence or whether the entire underpayment caused by the claimed farm loss as shown on Schedule F of petitioners' return and the passthrough loss from the subchapter S corporation as shown on *480 that return is due to negligence or intentional disregard of rules and regulations. Petitioners have made no specific showing with respect to whether the underpayment of tax is due to negligence, but argue that the same arguments that support their claim for the deduction support a conclusion that the underpayment was not due to negligence. We have determined that petitioners are not entitled to the claimed deductions. Petitioners were both well-educated individuals. They were aware of the many years of losses sustained in the Arabian horse activity. They were also aware of the manner in which they operated this activity and aware that they were not entitled to claim losses from this activity if it were not engaged in for profit. Considering the record as a whole, we conclude that the entire underpayment in this case was due to negligence and, therefore, the addition to tax under section 6653(a)(2) is applicable to the interest payable on the entire underpayment. Section 6661(a) imposes an addition to tax if there is a substantial understatement of income tax. A substantial understatement *481 exists where the understatement of tax exceeds the greater of $ 5,000 or 10 percent of the amount of tax required to be shown on the return. Clearly here there has been a substantial understatement of tax as defined in section 6661. Petitioners recognize that if they are not successful in their argument that the losses with respect to the Arabian horse activity are deductible, there has been a substantial understatement of tax. Their argument is that there is substantial authority for the position they took in claiming the Arabian horse activity losses and that the return made sufficient disclosure of their claimed deductions. Section 6661(b)(2)(B)(i) provides that an understatement of tax may be reduced, and the addition to tax accordingly reduced, if the taxpayers' treatment of an item was based on substantial authority. Petitioners argue that for the same reasons argued by them in support of their claimed loss deductions with respect to the Arabian horse activity, the claimed losses were based on substantial authority. As we pointed out in Schirmer v. Commissioner, 89 T.C. 277, 283 (1987), *482 "substantial authority" exists only when the facts and authorities with respect to the taxpayer's case, when analyzed, show that the weight of the authorities that support the taxpayer's position is substantial when compared with those supporting the contrary position. H. Rept. 97-760 (Conf.) at 575, 1982-2 C.B. 600, 650. In determining whether there is substantial authority for a position, section 1.6661-3(b)(2), Income Tax Regs., provides that the authorities to be considered are the applicable provisions of the Internal Revenue Code and other statutory provisions, regulations construing the statute, both temporary and final, court cases, administrative pronouncements, including revenue rulings and revenue proceedings, tax treaties and regulations thereunder, and Treasury Department and other official explanations of such treaties, and Congressional intent as reflected in committee reports, joint explanatory statements of managers included in conference committee reports, and floor statements made prior to enactment by one of the bill's managers. *483 In this case, there is little, if any, authority supporting petitioners' position. Numerous cases involving deduction of losses from an activity with respect to breeding or boarding horses under circumstances somewhat similar to those in the instant case have held that the activity was not one engaged in for a profit. The cases holding activities with respect to breeding or boarding horses to be activities engaged in for profit involve much more evidence of a business operation and much more showing of profit objective than are present in this case. Considering the record as a whole, we conclude that petitioners have not shown that there was substantial authority supporting their claimed deductions of losses with respect to the Arabian horse activity. We, likewise, conclude on the basis of this record that petitioners have failed to show that they adequately disclosed the relevant facts affecting the treatment of the claimed deductions with respect to the Arabian horse activity. In this regard the instant case is comparable to Schirmer v. Commissioner, supra at 285, where we concluded that a mere filing of a Schedule F, Farm Income and Expense Form, did *484 not constitute adequate disclosure. As we pointed out in the Schirmer case, the statute does not set forth what constitutes adequate disclosure of relevant facts, but the Secretary in regulations and respondent in revenue procedures, have provided for acceptable disclosure. For the same reason set forth in that case, the disclosure made by petitioners in this case does not meet the standards either of section 1.6661-4(c), Income Tax Regs., or Rev. Proc. 83-21, 1983-1 C.B. 680, or Rev. Proc. 84-19, 1984-1 C.B. 443. However, as we further pointed out in the Schirmer case, where a taxpayer fails to comply with the regulations and revenue procedures, the requirement of adequate disclosure on the return may be satisfied if the return provides sufficient information to enable respondent to identify the potential controversy. In Schirmer v. Commissioner, supra at 286, we concluded that a mere listing on Schedule F of the amount of farm income and expenses was not sufficient for respondent to identify the potential *485 controversy, which is whether the taxpayer engaged in the activity for profit. We pointed out that the mere filing of the farm schedule did not alert respondent to the fact that the activity might be one not engaged in for profit. We see no distinction in this regard between the instant case and the Schirmer case and, therefore, conclude that petitioners have failed to show adequate disclosure. Further, petitioners have failed to show that respondent abused his discretion in not waiving the addition to tax under section 6661. Mailman v. Commissioner, 91 T.C. 1079 (1988). Section 1.6661-6(a), Income Tax Regs., provides in connection with waiver of the addition to tax, that the addition may be waived on a showing by the taxpayer that there was reasonable cause for the understatement and that the taxpayer acted in good faith. Section 1.6661-6(b), Income Tax Regs., sets forth a number of circumstances which will be taken into account in determining whether the addition should be waived. The examples given of *486 reasonable cause include reliance on a position contained in a proposed regulation, a computational error, reliance on professional advice, or on an incorrect information return, or lack of knowledge of facts on the taxpayer's part. Petitioners have not shown that they met the criteria of section 1.6661-6(a) and (b), Income Tax Regs. We conclude that petitioners have failed to show that the Commissioner abused his discretion in not waiving the section 6661 addition to tax. See Mailman v. Commissioner, 91 T.C. at 1084. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year here in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. Includes net insurance recovery of $ 3,825 on Chatterbox.↩