T.C. Memo. 2014-253

UNITED STATES TAX COURT

RAYMOND PRICE, III AND LYNN M. PRICE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 4301-13, 8470-13.                    Filed December 16, 2014.

<u>Bertram P. Husband</u>, for petitioners.

<u>Jonathan E. Behrens</u> and <u>Brian S. Jones</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NEGA, <u>Judge</u>:  Respondent determined deficiencies of $75,802, $69,836, and $61,667 in petitioners' Federal income tax for the taxable years 2009, 2010, and 2011 (years at issue), respectively, and accuracy-related penalties of $15,160,

[*2] $13,967, and $11,920 under section 6662(a)[1] for the taxable years 2009, 2010, and 2011, respectively. The issues for decision are (1) whether petitioners' horse activity and their automobile dealership activity should be characterized as a single activity for purposes of section 183, (2) whether petitioners' horse activity was engaged in for profit for purposes of section 183, and (3) whether petitioners are liable for the accuracy-related penalty pursuant to section 6662(a).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by reference. At the time the petition was filed, petitioners Raymond Price III and Lynn M. Price resided in Pennsylvania.

I.    Automobile Dealerships

Mr. Price is a third-generation automobile dealer whose family has been selling cars in the Poconos since 1913. Mr. Price began working at his father's Lincoln Mercury dealership, begun in 1940 by his grandfather, in June 1981 after graduating from college. Mr. Price purchased the Lincoln Mercury dealership

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[*3] from his mother and father's estate in or about 1982. Mr. Price purchased a Honda-Mazda dealership in 1990, a Stroud Ford dealership in 1994, and Ford, Chevrolet, and Volvo-Suzuki dealerships in 2007. The 2007 Ford and Chevrolet dealerships were purchased from Mr. Price's cousins and were originally owned by Mr. Price's uncle.

Petitioners' automobile dealerships (dealerships) are operated through four Pennsylvania corporations: (1) Ray Price Chevrolet, Inc., which sells Chevrolets; (2) Ray Price Motors Imports, Inc., which sells Hondas, Mazdas, and Volvos; (3) Ray Price Ford Sales, Inc., which sells Fords and Lincolns; and (4) Ray Price Ford, Inc., which sells Fords (collectively, corporations). Petitioners are the sole shareholders of Ray Price Chevrolet, Inc., Ray Price Motors Imports, Inc., and Ray Price Ford Sales, Inc. Mr. Price owns 51% of Ray Price Ford, Inc. Mr. Price also owns a 49% shareholder interest in Asheboro Ford, Inc., a corporation selling Fords in Asheboro, North Carolina. The corporations are taxed as S corporations for Federal income tax purposes. For each of the years at issue, all the corporations filed Form 1120S, U.S. Income Tax Return for an S Corporation.

Petitioners' automobile business is highly successful. Mr. Price has worked hard to grow the automobile dealerships and still works over 60 hours per week at his various dealerships, including holding weekly meetings at each. When he

[*4] purchased the Lincoln Mercury dealership from his father in 1981, it was selling fewer than 100 cars per year. The dealerships now sell approximately 5,000 cars per year to retail customers and approximately 3,000 cars per year at wholesale or dealer auctions. In 2012 the dealerships' gross receipts totaled more than $96 million. Additionally, Mr. Price has transformed several unprofitable dealerships into profitable enterprises. However, he failed to transform the Volvo-Suzuki dealership into a profitable enterprise.

The economic downturn in 2008 and 2009 affected the automobile industry nationwide. Mr. Price's dealerships did suffer a drop in sales, but they managed to avoid laying off a single employee. After General Motors declared bankruptcy in 2009, Mr. Price received notice that the dealership agreement for the Chevrolet dealership he had purchased in 2007 would be terminated. Following negotiations, General Motors instead set sales objectives for the Chevrolet dealership. If these sales objectives were not met, the dealership agreement for the Chevrolet dealership would be terminated at the end of 2011 or 2012. The sales objectives were met, and Mr. Price retained the Chevrolet dealership.

Mr. Price analogized his business philosophy to a stool with three legs representing margin, volume, and expense. Mr. Price believes that, as long as these three factors are controlled, the stool will be strong enough to support the

[*5] weight of whatever is placed on top of it, be it "a Ford or a Chevy or a Honda or a Volvo".

Petitioners' gross income, excluding the losses attributable to the horse activity, discussed infra, totaled $2,484,136 for tax year 2009, $1,212,419 for tax year 2010, and $1,989,222 for 2011.

II.    Petitioners' Property

Petitioners purchased 150 acres in Shawnee on Delaware, Pennsylvania, in 1985 for $150,000 (property).  Petitioners have improved the property extensively, clearing heavy growth, fencing between 90 and 100 acres, installing two septic systems and two wells, and constructing various outbuildings, including a 42-by 60-foot pole barn, a 53-by 76-foot barn, a large main barn discussed in further detail below, and a mobile 25-by 30-foot shed.  In or around 1986 petitioners began renovating a dilapidated farmhouse on the property that they have used as their principal residence since 1987 (farmhouse).  An appraisal dated November 19, 2013, by Thomas G. McKeown estimated the value of the entire property to be $1,500,000, with the farmhouse valued at $335,000.

In 1997 petitioners sold approximately 27 acres of the property for approximately $400,000.  The property was originally scheduled to be sold in 1994 for $271,000, but the buyer encountered difficulties and the closing was

[*6] delayed until 1997. Mr. Price stated that the difference in the selling price was due to the buyer's paying prime interest retroactive to the original closing date. The acreage sold in 1997 is now part of a golf course.

III. Horse Activity

Mr. Price grew up around horses. His family became involved with Arabian horses in 1964 when he was four years old. Mr. Price began training horses for his family's clients at the age of 13, and by age 17 he was a member of the Pennsylvania State championship 4-H judging team. His mother, Margaret Price, was a very accomplished rider who was a member of the U.S. Equestrian Team and received the Pegasus Medal of Honor from the U.S. Equestrian Foundation in recognition of her work with horses. Margaret Price also was a bronze and silver medal winner while on the U.S. Equestrian Team. There are aspects of training and caring for horses that Mr. Price enjoys, and he takes pride in seeing his horses excel in competition. Petitioners' daughter is an accomplished rider who rode during the years at issue although she has not ridden in three years. Both Mr. Price and his daughter competed in horse shows during the years at issue. Mrs. Price did not testify at trial, but Mr. Price stated that Mrs. Price and petitioners' son do not like horses.

**[*7]** Petitioners began their horse activity in or about 1993. Petitioners formed Rock Ledge Arabians, LLC (Rock Ledge), on September 22, 2011, and have since operated their horse activity under this name.[2] The goal of Rock Ledge is to operate as a full-service horse farm with breeding, boarding, training, hauling, and showing of horses. Additionally, Mr. Price believes that breeding-only farms are no longer profitable within the Arabian horse industry and that a trainer-centric model is required for success. As a result, Mr. Price sought to offer a variety of services at Rock Ledge, including breeding, training, boarding, and showing/hauling horses to horse shows.

Petitioners have built several structures to accommodate horses on the property. There are a number of "run-in" sheds on the property, which are three-sided sheds that horses can enter and exit on their own. Additionally, the property contains a 42-by 60-foot barn used for equipment storage and a five-stall barn with an indoor training pen. In 2006 and 2007 petitioners constructed a large barn with 19 stalls, a lounge area, restrooms, and workrooms.

---

[2]Although Rock Ledge was not formed until 2011, the Court will refer to petitioners' horse activity for all years, including those not at issue, as "Rock Ledge".

[*8]  A.    Rock Ledge's Business Plan

Petitioners submitted as part of the record in these cases a business plan pertaining to Rock Ledge.  The business plan is undated but contains the heading "Business Plan:  2008-2010".  The business plan is not paginated, but it contains three pages and outlines the objectives related to Rock Ledge.  Specifically, the plan discusses five main goals listed on the first page:  (1) breed Half-Arabian horses; (2) breed the stallion Reflection RL; (3) generate clients through trainer Justin McManus for boarding, training, and showing/hauling fees; (4) sell horses through "in barn marketing"; and (5) sell vehicles through "relationship marketing".  The first three goals are discussed in further detail on the first and second pages of the business plan, and the second page calculates that the first three goals would produce an income stream of $240,700 "with 10 horses", $414,700 "with 20 horses", or $588,700 "with 30 horses".  It is unclear how petitioners calculated the anticipated income from "20 horses" and "30 horses" since the business plan does not contain calculations with respect to these figures.  Additionally, it appears that the "total income" figure is one of gross income, rather than net income, since the business plan does not contain any reference to expenses, such as veterinary care or feed costs.  The third page of the business plan includes "additional income" that discusses petitioners' goals with respect to

[*9] (1) vehicle sales to "horse-related customers", and (2) petitioners' expectation that the property would significantly increase in value, which was not included as one of the five main goals listed on the first page of the business plan.  Petitioners' goals are discussed in further detail herein.

### 1. Breeding Half-Arabian Horses

Mr. Price chose to breed Half-Arabians instead of purebred Arabians because he believed the market for Half-Arabian horses to be competitive with purebred Arabians.  As part of Rock Ledge's goal of selling Half-Arabian horses, the business plan called for selling three Half-Arabian foals per year at a price of $15,000 each for gross income of $45,000.

Rock Ledge maintains equipment to facilitate breeding services, including a phantom mare equipped with an artificial vagina for stallion semen collection, microscopes used to evaluate sperm motility, and cooled semen shipping containers.  Additionally, Ray Price Motors Imports, Inc., accepts shipments of cooled stallion semen collected offsite for use at Rock Ledge.  At the time of trial Rock Ledge maintained a Web site listing horses available for sale.  Each listing contains information relating to a particular horse's dam, sire, and type of performance and any accomplishments the horse might have achieved, such as major awards.

**[\*10]** Petitioners denote horses bred at Rock Ledge with the suffix "RL" at the end of the horses' names, a practice they adopted from Sheila Varian of Varian Arabians, a top breeder. Petitioners sold the horse Prego RL on September 15, 2008, although the price at which Prego RL was sold was not submitted to the Court. Petitioners sold several horses in 2012 and 2013, including Enoree RL on December 23, 2012, for $1;[3] Gianna RL on December 23, 2012, for $1; Khody RL on January 11, 2013, for $13,000, which included a $1,000 credit for use at Rock Ledge; Villanova RL on June 5, 2013, for $10,000; Jason El Jamaal RL on July 6, 2013, for $17,000; Gunners Moon RL on August 10, 2013 for $4,750; and Evidence RL on August 11, 2013, for $10,000.

Rock Ledge also facilitates sales of client horses by acting as a sales agent. As an example petitioners cite the sale of Ggrand Slam in or about August 2012 for $15,000, for which they received a 15% commission. Following the August 2012 sale of Ggrand Slam, Rock Ledge purchased the horse from the original buyer for $6,000 because the buyer had encountered financial difficulties following her purchase of the horse. Petitioners sold Ggrand Slam on

---

[3]Petitioners stated that the horses Enoree RL and Gianna RL were sold for $1 as culls. Culling horses allows the buyer to shoulder the expense of the horse; therefore, petitioners argue it is a profit-motivated practice since it reduces the ongoing expense of caring for the horse.

[*11] December 27, 2013, for $8,000. Petitioners did not sell any horses during the years at issue.[4]

Petitioners believe that their horses have the potential to be sold for very high prices. Petitioners stated that the stallion *Aladdinn was syndicated for $6,300,000 with 42 shares sold at $150,000 each. It appears that at some point Rock Ledge owned a daughter of *Aladdinn, the mare Evensong AH, but it was unclear at the time of trial whether Rock Ledge still owned Evensong AH. Evensong AH was not on the list of horses appraised by petitioners' expert witness, discussed infra, although she did appear on inventory lists for the years at issue. Additionally, Evensong AH was diagnosed with mild chronic degenerative endometritis, which reduced her value as a broodmare, the "only function" for which petitioners purchased her. Apart from the alleged value of *Aladdinn, Mr. Price was influenced by family friends of his parents, Leonard and Jean Skeggs, who had sold horses for up to $500,000 each.

---

[4]Petitioners' 2009 Schedule F, Profit or Loss From Farming, reflects income of $19,500 due to sales of "livestock, produce, grains, and other products". Petitioners did not file any Forms 4797, Sales of Business Property, for the years at issue. Schedule F instructs taxpayers to report income derived from the sale of livestock held for breeding or sport on Form 4797. In the light of the fact that petitioners' briefs are silent as to any sales of horses occurring in 2009, the Court concludes that the 2009 sales income was not due to the sale of horses.

[*12] Petitioners submitted the report of an expert witness to corroborate their beliefs concerning the future value of Rock Ledge's horses. William Hughes (Professor Hughes) is professor emeritus at California State Polytechnic University at Pomona and also serves as the treasurer of the U.S. Equestrian Foundation. Professor Hughes evaluated petitioners' horses on December 10, 2013. Professor Hughes appraised the herd at a total value of $575,000, with individual horses ranging in value from $7,500 to $75,000. Seven of the twenty horses evaluated were sired by Reflection RL, discussed in further detail infra, with values ranging from $7,500 to $70,000. Professor Hughes' report includes an evaluation sheet for each horse that contains 17 conformation categories and three different outlines of a horse's profile that can be used for marking down any unique characteristics. In 19 of the 20 evaluation sheets submitted with Professor Hughes' report, the horses received a "good" rating in all 17 conformation categories. One horse, Midnight Magnum, received a "very good" rating in the "present condition" category; Professor Hughes appraised Midnight Magnum as the most valuable horse in the herd at $75,000.

**[\*13]**      2.      <u>Breeding Stallion Reflection RL</u>

Apart from breeding Half-Arabian horses with its own broodmare band, Rock Ledge aimed to generate fees by offering the stud services of Reflection RL, a purebred Arabian horse. Petitioners' business plan calls for breeding Reflection RL 15 times per year at a price of $1,200 per breeding for total gross income of $18,000. Reflection RL sired either 14 or 15 foals before he suffered a leg injury in August 2009 that ultimately resulted in his having to be euthanized in either late 2009 or early 2010.

     3.      <u>Trainer-Generated Income</u>

Petitioners also sought to increase Rock Ledge's income by offering the services of a professional trainer, which they believed would generate income from boarding, training, and showing/hauling fees. Petitioners initially employed Justin McManus as the trainer at Rock Ledge. Mr. McManus did not bring in the number of clients petitioners expected, and as a result petitioners terminated his employment in late 2010. Petitioners replaced Justin McManus with two professional trainers, Chris and Nicole Hall, in September 2011. Mr. Price is satisfied with their performance and indicated that they have met Rock Ledge's expectations in terms of generating clients. Specifically, Mr. and Mrs. Hall have generated some new clients who pay boarding, training, and showing/hauling fees

[*14] to Rock Ledge. In addition to employing Mr. and Mrs. Hall as trainers, petitioners employ Terry Steckel as the barn manager of Rock Ledge and employed her during the years at issue. Mr. and Mrs. Hall and Ms. Steckel are covered under the same policies as dealership employees for worker's compensation and employer's liability insurance and health insurance; additionally, they are paid from the same ADP payroll account used for dealership employees. Petitioners did not deduct the cost of paying any Rock Ledge employees on their 2009-11 Schedules F.

Petitioners submitted invoices from 2009, 2010, and 2011 that purport to show trainer-generated income for the years at issue. The 2009 invoices reflect fees charged to clients for boarding and some hauling fees. Petitioners reported $22,726 in boarding income and $2,292 in show winnings on their 2009 Schedule F. Petitioners deducted $28,577 in training expenses for 2009. The 2010 invoices reflect boarding fees charged to clients and one instance of a trailering fee. Petitioners reported $12,550 in boarding income and $490 in show winnings on their 2010 Schedule F. Petitioners deducted $50,599 in training expenses for 2010. The 2011 invoices reflect boarding fees, training fees, hauling fees, and show fees. Petitioners reported $56,807 in boarding income and $600 in show

[*15] winnings on their 2011 Schedule F.  Petitioners deducted $20,265 in training expenses on the 2011 Schedule F.

Petitioners assert that Rock Ledge currently leases horses, which obligates the lessee to pay the expenses of feeding and training the horse and may also bring additional income in the form of showing and hauling fees paid to Rock Ledge if the lessee chooses to enter the horse into shows.  There are only two horse leases in evidence, both of which are signed by the same lessee, both of which are unsigned by a Rock Ledge representative, and both of which contain suspect dates for the periods the leases purportedly cover.  The lessee in both contracts is the same person, Sheila Curley.  One contract (2012 contract) covers the period from April 1, 2012, to July 31, 2012, and is for the horse Grady Afire.  Sheila Curley signed as the lessee.  It appears the 2012 contract was originally dated April 1, 2013, but the "3" in 2013 has been crossed out and a "2" written in its place so as render a contract date of April 1, 2012.  The 2012 contract is not signed by anyone from Rock Ledge as the lessor.  The other contract (2013 contract) covers the period from May 1, 2013, to July 1, 2013, and is for the horse Kaptn Bravado.  Sheila Curley signed and dated the 2013 contract on June 29, 2013, two days before the end of the contract period.  As with the 2012 contract, the 2013 contract is not signed by anyone representing Rock Ledge as the lessor.  These two

[*16] contracts lack any probative value, considering that there are defects in the dates on both contracts and that they are unsigned by the lessor, and we find it suspicious that both contracts relate to the same person. Consequently, the Court does not find that Rock Ledge currently leases horses. There is no evidence in the record that Rock Ledge leased horses during the years at issue.

Petitioners also claim that Rock Ledge currently offers riding lessons. As evidence, petitioners offered a one-page handwritten document containing estimated revenues from Rock Ledge during 2013. The document is undated, but petitioners stated that it was prepared in December 2013, less than one month before trial in these cases. The document estimates that Rock Ledge will have earned $1,300 from riding lessons during 2013 but contains no information as to how this number was calculated, such as the price of a riding lesson or the number of lessons sold. Considering the lack of evidence on the record, the Court concludes that Rock Ledge does not currently offer riding lessons. There is no evidence that Rock Ledge offered riding lessons during the years at issue.

4. In Barn Marketing

Petitioners' business plan also calls for "in barn marketing". The business plan does not elaborate on what is meant by in barn marketing, but Mr. Price explained at trial that horses bred by Rock Ledge were to be marketed to existing

[*17] clients who used other services at Rock Ledge. In this manner, clients could "upgrade" to a horse already in the barn at Rock Ledge. Mr. Price referred only to "farm bred" horses when he discussed those to be marketed through in barn marketing. Thus, it appears to the Court that in barn marketing is an extension of part 1 of the business plan, to breed and sell Half-Arabian horses.

### 5. Vehicle Sales

Petitioners' business plan for Rock Ledge also calls for vehicle sales through what Mr. Price labels "relationship marketing". Mr Price sought to market cars sold at his dealerships to "horse customers", by which he meant not just Rock Ledge clients but also people he met at horse shows. Attendees of horse shows who knew that Mr. Price owns several dealerships ask him about various trucks or cars in "the same way doctors get asked when they're out socially about what to fix". Mr. Price realized that people who own horses also need trucks that are capable of pulling trailers. Further, Mr. Price needed to know the vehicle towing capacities to determine the best fit for a particular customer's towing needs, depending on the type and size of the trailer to be pulled. "Horse customers" trust Mr. Price because of the "relationship" developed through the horses, which is why he terms the marketing of vehicles through horse-related activities "relationship marketing". To implement "relationship marketing",

[*18] petitioners engaged in a small amount of cross-marketing between the automobile dealership activity and Rock Ledge, used a dealership employee to design Rock Ledge advertising, and arranged for another dealership employee to be available for car sales on the days of horse shows.

Petitioners sought to cross-market the automobile dealership activity and Rock Ledge. Specifically, Mr. Price designed the Rock Ledge Arabians logo to mimic the design and colors of the Ford logo. Mr. Price placed two magnetic signs on each vehicle he transported to horse shows. One sign bore the Rock Ledge logo, and the other sign advertised RayPriceCars.com, with the slogan "99 Years of Doing It Right" below the Web site address. Exhibit 117-P shows the two signs together. It is unclear when the photograph of the signs was taken although it appears that the RayPriceCars.com sign would not have been used until at least 2012, considering that Mr. Price's grandfather began his first automobile dealership in 1913.[5]

Petitioners also placed advertisements in various horse magazines and newsletters. In some instances, these advertisements advertised only the

---

[5]Although signs featuring "99 Years of Doing It Right" do not reference the year 2012, Exhibit 47-P contains the slogan "100 Years of Doing It Right" and displays "1913" and "2013". Therefore, we conclude that signs with "99 Years of Doing It Right" would have been used in advertising during 2012.

[*19] dealerships, whereas in others they advertised only Rock Ledge.  Petitioners submitted various exhibits to the Court purporting to be samples of advertising where the same advertisement covered both the dealerships and Rock Ledge.  However, Exhibit 24-P, showing an advertisement for the Region 15 Championship Omnibus to be held in 2012, does not mention either Rock Ledge or any of the dealerships.  Exhibit 25-P, which is a copy of a 2000 print advertisement appearing in the publication Horse News, advertises Ray Price Cars and lists various "elite rider[s] & trainers" who are customers of Mr. Price's dealerships but does not mention Rock Ledge or petitioners, except insofar as the name "Ray Price" is used in reference to the automobile group.  Only one exhibit submitted to the Court actually advertises both Rock Ledge and RayPriceCars.com, with the slogan of "99 Years of Doing It Right" and the slogan "We Know Horsepower!".  As with the magnetic sign depicted in Exhibit 117-P, it appears to the Court that the slogan "99 Years of Doing It Right" would have been used in 2012, after the years at issue.  Before beginning Rock Ledge, Mr. Price was aware that automobile dealerships advertised in journals and magazines read by horse enthusiasts.  There is no evidence that there was cross-advertising during the years at issue.

[*20] As of the time of trial Rock Ledge maintained a Web site advertising services offered and horses available for sale. The Web site contains a button labeled "We Know Horsepower" that, when clicked, takes the visitor to RayPriceCars.com. It is unclear whether the Web site existed during the years at issue.

Petitioners used some dealership employees in conjunction with Rock Ledge. Petitioners submitted Exhibit 118-P as support for their assertion that dealership employees worked on behalf of Rock Ledge. Exhibit 118-P contains 26 pages of handwritten notes in Mr. Price's handwriting. The pages were from a notebook Mr. Price kept at the Stroud Ford dealership. Many of the pages are undated, but those that are dated bear dates from 2000 and 2001. One page directs a dealership employee, Pat Adelmann, to email information to a person who had shown interest in one of Rock Ledge's horses. Additionally, petitioners arranged for a dealership employee, Michael Brotzman, to be available by cell phone during horse shows to answer questions related to the dealerships' inventory. Mr. Price would tell Mr. Brotzman the dates and times of horse shows and direct him to be available during those times. Mr. Brotzman usually received one to five calls per weekend from Mr. Price, and he would arrange for the delivery of a vehicle if someone at a horse show decided to purchase a car or truck. Mr. Brotzman

[*21] directly assisted only in the sales of Ford vehicles; for Chevrolet sales he would refer Mr. Price to a different salesman at Ray Price Chevrolet, Inc.

Petitioners assert that Rock Ledge has generated a significant number of customers for the dealerships. Petitioners submitted a two-page list of "horse customers" purporting to list the names of individuals and organizations who have purchased vehicles from the dealerships. The list is undated and contains the names of 82 "customers" although some entries do not appear to be complete. For example, the entry "Sussex - N.J. - Ford F-250 (Traded Horse Trailer)" could be a customer with the last name Sussex or a customer in Sussex, New Jersey. In either case, this entry does not name a "horse customer" with any specificity. The list denotes with asterisks 23 customers who bought multiple vehicles and denotes with double asterisks 5 customers who bought more than 10 vehicles. Petitioners were unable to provide an exact number of vehicles bought by the people appearing on the list. But in slower years the dealerships sell 40 to 60 cars per year to "horse customers", and in better years they sell 60 to 70 cars per year to "horse customers". Rock Ledge's business plan states that gross sales of vehicles to horse-related customers have averaged more than $500,000 annually for more than 10 years. Petitioners submitted a number of contracts that they claim represent sales to "horse customers". However, the contracts do not specifically

**[*22]** identify the buyers as "horse customers", and at least five contracts that petitioners submitted involved sales or trades to other dealers or auto auctions.

Separate and apart from the list of "horse customers", petitioners have loyal customers in the Kanavy family. Valerie and Lawrence Kanavy were friends of Mr. Price's mother and owned at least one horse in partnership with Mr. Price's parents. Valerie Kanavy rode horses with Margaret Price, and the Kanavys' son, Timothy Kanavy, has known Mr. Price since childhood. The Kanavys operate Trevdan Building Supply (Trevdan), a building materials business for commercial residential buildings. Trevdan has purchased 300 to 400 vehicles from Mr. Price beginning in 1982 when he founded his first dealership. Additionally, Timothy Kanavy stated that his family members purchase their personal vehicles from Mr. Price. Mr. Price stated that the Kanavys, along with other customers, switched from buying Fords to buying Chevrolets in order to help the Chevrolet dealership achieve its 2011 and 2012 sales objectives, which helped the Chevrolet dealership avoid termination of its dealership agreement. When asked about the business relationship between Trevdan and Mr. Price, Timothy Kanavy gave the following testimony:

[*23]

Q:    Why does your family do business with Ray Price?

A:    Through the horses.  My parents met his mom and that's the only reason because they rode a lot together.

Q:    And why does Trevdan do business with Ray Price?

A:    Because of the relationship my mom and his mom had and my father, through the horses.

### 6.    Appreciation in Land Value

Appreciation in land value is not listed as one of the five main goals on Rock Ledge's business plan.  However, it is listed as a source of "additional income" on the third page of the business plan.  As previously discussed, the property on which the farmhouse and Rock Ledge are situated has been appraised at $1.5 million.  Petitioners assert that when sold, the property will yield long-term appreciation of more than $1 million, but they have not provided any information related to the basis of the property except for the original purchase price of $150,000.

### B.    Horse Show Marketing and Barn Construction

Petitioners also marketed Rock Ledge by entering horses in competitions at horse shows.  Petitioners distributed flyers listing horses for sale, hung custom

[*24] stall drapes with the Rock Ledge logo, and set up an area where clients could sit comfortably and watch videos of horses available for sale.

Petitioners also distributed T-shirts promoting the dealerships at horse shows. Petitioners submitted a photograph of a dog wearing a T-shirt advertising RayPriceCars.com although it is not clear that the dog is actually at a horse show; additionally, the T-shirt celebrates the centennial of Ray Price dealerships in 2013, meaning it was likely distributed after the years at issue. The T-shirt advertises only RayPriceCars.com and does not mention Rock Ledge. In 2011 Ray Price auto group donated two cars to be raffled off at the 2011 North American Arabian Horse Show Association World Championship Horse Show. There is no evidence that the donation of the cars was used to promote Rock Ledge.

Petitioners constructed a large barn on the property that was completed in 2007. The barn contains 19 horse stalls, a lounge area, restrooms, and workrooms. The lounge is meant to serve as an area where customers can relax and watch through a window into an indoor area where their horses are being worked. The lounge has a seating area, a TV, and a small bar with stools. The bar is portable and is often taken to horse shows. The barn also has wash racks for washing and grooming horses, saddle tack rooms, and a washer and dryer for horse blankets.

[*25] C.     Financials of Rock Ledge

Mrs. Price does all of the recordkeeping and bookkeeping for Rock Ledge. For the taxable years 2005 through 2012 petitioners reported Rock Ledge on Schedule F, attached to their Forms 1040, U.S. Individual Income Tax Return. For those years petitioners reported losses as follows:

| Taxable year | Loss |
| --- | --- |
| 2005 | ($91,710) |
| 2006 | (83,503) |
| 2007 | (151,849) |
| 2008 | (225,544) |
| 2009 | (174,492) |
| 2010 | (195,904) |
| 2011 | (147,242) |
| 2012 | (85,022) |
| Total | (1,155,266) |

Rock Ledge has not made a profit since it was begun in 1993. Petitioners did not deduct the cost of any labor hired for the years at issue. Tax year 2009 was the only year at issue for which any advertising cost deductions were claimed; for that year, petitioners reported $1,120 in advertising costs. For each of the years at issue, Rock Ledge did not generate enough income to cover the costs associated with feeding the horses.

[*26] Petitioners hired Robert J. Murphy to prepare their income tax returns for the years at issue. Mr. Murphy is a certified public accountant (C.P.A.) with the firm of Boyer & Ritter in Camp Hill, Pennsylvania. Boyer & Ritter specializes in accounting work for automobile dealerships. Mr. Murphy has prepared petitioners' individual income tax returns and the corporations' tax returns since 2002. In addition, Mr. Murphy has also served as the corporations' accountant since 2002, in which capacity he prepares balance sheets, income statements, and statements of cashflow.

The IRS has audited petitioners' returns on two prior occasions, in 1999 and 2007, and concluded that Rock Ledge was conducted with a profit objective. Mr. Murphy consulted with Mr. Price regarding his prior methodology for reporting Rock Ledge's losses and decided to continue reporting Rock Ledge on Schedule F, as Mr. Price had previously done before hiring Mr. Murphy as his accountant.

Mr. Murphy does not audit the books and records of Rock Ledge, nor does he prepare any financial statements for it. Boyer & Ritter has other clients who file Schedules F, but petitioners are the only clients for whom Mr. Murphy prepares a Schedule F. Additionally, none of Mr. Murphy's other clients operated a horse activity. Petitioners did not file any Forms 4797 for the years at issue.

**[\*27]** D.  <u>Setbacks</u>

Petitioners suffered a number of setbacks to Rock Ledge over the years. The mare Bey-Rose Gal died of unknown causes in 2002.  The mares Overlook Galaxina and Pasazz both died in 2003.  The mare Silver Lining injured her knee in 2004 and had to be euthanized.  The stallion Reflection RL had to be put down after an injury in late 2009 or early 2010.  The mare Galoreus RL had to be euthanized because of a virus in 2010.  Zips Reflection RL, whose sire was Reflection RL, became paralyzed in 2011 after stumbling in his training pen; consequently, he also had to be euthanized.  The mare Gianna RL developed an infection in her joints and was culled in 2012 for $1.

A number of Rock Ledge's horses aborted or had other reproductive complications, including:  a mare that developed uterine torsion while in foal in 2000; mares that developed uterine cysts in 2000 and 2005, resulting in their inability to be used for breeding; a mare that foaled a stillborn foal with a wry nose in 2001; two foals out of the same mare and stallion that developed cherry-colored hooves and died shortly after birth in 2003 and 2004; a foal whose testicles did not descend and that had to be gelded with expensive surgery in 2005; mares that spontaneously aborted in 2003, 2006, 2007 and 2008; and a mare whose foal presented in breech, resulting in the death of both the foal and the mare in 2009.

[*28] At a point which the record does not reflect, but probably between 2000 and 2003, Mr. Price reached out to contacts at Penn State University regarding the high number of abortions his mares were experiencing.[6] In response, he received a copy of a bulletin written by Professor Marvin H. Hall discussing spontaneous abortions by mares in Kentucky. The bulletin describes how eastern tent caterpillars living in wild cherry trees may produce excrement containing chemicals that cause mares that eat the excrement to abort. In response, Mr. Price removed all of the wild cherry trees on his property.

E.  Audit and Notices of Deficiency

By letter dated November 7, 2011, respondent informed petitioners that their 2009 income tax return had been selected for audit. At some point the audit was expanded to tax years 2010-11. Respondent mailed a notice of deficiency relating to tax year 2009 to petitioners on November 27, 2012. Respondent mailed a separate notice of deficiency relating to tax years 2010-11 to petitioners on February 28, 2013.

------

[6]Mr. Price did not identify the year in which he contacted Penn State, but at trial he stated that Kentucky experienced spontaneous abortions of mares between 2000 and 2003. The bulletin he received from Professor Hall is undated but references the Kentucky abortions as a concurrent event.

**[\*29]**                                    OPINION

## I.    Burden of Proof

Generally, the taxpayer bears the burden of proving, by a preponderance of the evidence, that the determinations of the Commissioner in a notice of deficiency are incorrect.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). This burden may shift to the Commissioner if the taxpayer introduces credible evidence with respect to any relevant factual issue and meets other conditions, including maintaining required records.  See sec. 7491(a). We decide this case on the preponderance of the evidence and accordingly need not address whether the burden of proof has shifted.  See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005).

## II.    Section 183

Taxpayers may generally deduct all ordinary and necessary business expenses paid or incurred during a taxable year in carrying on a trade or business. Sec. 162(a).  In general, no deductions are allowable for expenses incurred in connection with activities not engaged in for profit, such as activities carried on primarily as a sport or hobby or for recreation, except to the extent provided by section 183(b), discussed infra.  Sec. 1.183-2(a), Income Tax Regs.  Section 1.183-2, Income Tax Regs., sets forth a nonexclusive list of relevant factors to be

[*30] considered in determining whether an activity is engaged in for profit. To be engaged in an activity for profit, the taxpayer must have an actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without opinion, 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs. A taxpayer's expectation of profit need not be reasonable, but it must be a good-faith expectation. Allen v. Commissioner, 72 T.C. 28, 33 (1979) (citing section 1.183-2(a), Income Tax Regs.); Dunn v. Commissioner, 70 T.C. 715, 720 (1978), aff'd, 615 F.2d 578 (2d Cir. 1980); Churchman v. Commissioner, 68 T.C. 696, 701 (1977); Benz v. Commissioner, 63 T.C. 375, 383 (1974). A mere declaration of profit objective is not controlling, and the Court will give greater weight to all objective facts and circumstances than to a taxpayer's statement of intent with regard to the activity. Dreicer v. Commissioner, 78 T.C. at 645.

If an activity is not engaged in for profit, section 183(b)(1) allows deductions that would be allowable without regard to whether the activity is engaged in for profit. Section 183(b)(2) allows deductions equal to the amounts of deductions that would be allowable if the activity were engaged in for profit, but only to the extent gross income derived from the activity exceeds the deductions allowed by reason of section 183(b)(1).

**[*31]** Section 183(d) creates a presumption of a profit objective if, for three of the five taxable years ending with the year at issue, gross income exceeds the deductions attributable to the activity. In cases such as this one where the activity consists in major part of the breeding, training, showing, or racing of horses, a presumption of profit objective exists if gross income exceeds the deductions for two of the seven taxable years ending with the year at issue. Sec. 183(d). Rock Ledge has not turned a profit since it was commenced in 1993, and thus the presumption created by section 183(d) does not apply.

Respondent disallowed the loss deductions attributable to Rock Ledge on the grounds that the activity giving rise to the losses was "not engaged in for profit" within the meaning of section 183. Petitioners contend that Rock Ledge was engaged in for profit and that Rock Ledge and the automobile dealership actively are sufficiently interrelated to make them one activity for purposes of section 183.

A. Scope of Activity

Before resolving whether Rock Ledge was engaged in for profit, we must determine the scope of the activity that is at issue. Before trial the parties jointly moved to bifurcate trial to first decide the issue of whether Rock Ledge and the automobile dealership activity constituted one activity or separate activities. The

[*32] motion indicated that if the Court determined Rock Ledge and the automobile dealership activity constituted one activity, respondent would concede that Rock Ledge was engaged in for profit within the meaning of section 183. The Court denied the parties' motion on December 5, 2013, and trial was held on all issues on January 14 and 15, 2014, in Philadelphia, Pennsylvania.

Petitioners argue that Rock Ledge and the automobile dealership activity are sufficiently interconnected to constitute one activity. They rely heavily on our decision in Topping v. Commissioner, T.C. Memo. 2007-92, 2007 Tax Ct. Memo LEXIS 88. Respondent argues that Rock Ledge and the automobile dealership activity are separate activities. Under section 1.183-1(d)(1), Income Tax Regs., the Court may consider all facts and circumstances to determine whether a taxpayer's separate undertakings constitute one activity for purposes of section 183. In relevant part, section 1.183-1(d)(1), Income Tax Regs., provides as follows:

> Generally, the most significant facts and circumstances in making this determination are the degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various undertakings. Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities. The taxpayer's characterization will not be accepted,

[*33] however, when it appears that his characterization is artificial and cannot be reasonably supported under the facts and circumstances of the case. * * *

The Court considers these and other factors in determining whether a taxpayer's characterization of two or more undertakings as one activity is reasonable. These other factors (Mitchell factors) include: (1) whether the undertakings are conducted at the same place; (2) whether the undertakings were part of the taxpayer's efforts to find sources of revenue from his or her land; (3) whether the undertakings were formed as separate activities; (4) whether one undertaking benefited from the other; (5) whether the taxpayer used one undertaking to advertise the other; (6) the degree to which the undertakings shared management; (7) the degree to which one caretaker oversaw the assets of both undertakings; (8) whether the taxpayer used the same accountant for the undertakings; and (9) the degree to which the undertakings shared books and records. Mitchell v. Commissioner, T.C. Memo. 2006-145 (citing Keanini v. Commissioner, 94 T.C. 41, 46 (1990), Tobin v. Commissioner, T.C. Memo. 1999-328, Estate of Brockenbrough v. Commissioner, T.C. Memo. 1998-454, Hoyle v. Commissioner, T.C. Memo. 1994-592, De Mendoza v. Commissioner, T.C. Memo. 1994-314, and Scheidt v. Commissioner, T.C. Memo. 1992-9). We examine these factors in turn.

**[\*34]**      1.      <u>Mitchell Factors</u>

           a.      <u>Location of Activities</u>

The activities are not conducted at the same location. Rock Ledge activity is conducted primarily on the property, which also includes petitioners' personal residence. In contrast, the automobile dealership activity is conducted at various dealerships. Petitioners contend that there are some aspects of each activity that are conducted at the same locations. For example, petitioners cite the receipt of cooled stallion semen at the Honda dealership as evidence that a horse activity is conducted at that dealership; petitioners also claim that Mr. Price's handwritten notebook he kept at the Stroud Ford dealership is evidence of a horse activity conducted at that location. Petitioners also cite the delivery of vehicles to horse shows, which they argue serve both as "car store operations" and as alternative locations of Rock Ledge. These arguments are unconvincing. Just as mailing a personal letter from one's place of business does not transmute the nature of the letter, the receipt of cooled stallion semen at the Honda dealership does not make the automobile dealership a location where horse sales are conducted. Further, Mr. Price's astute business sense enables him to sell cars even when he is not working at the dealerships; the fact that these cars are delivered elsewhere does

[*35] not broaden the physical location of the dealerships.  This factor favors respondent.

                  b.      The Activities as Efforts to Derive Revenue From Land

Petitioners make two arguments.  First, petitioners argue that since they bought the property with the intent to operate a horse farm on it, Rock Ledge is an effort to derive revenue from their land.  Second, they contend that since vehicle sales have been made to "horse customers", the automobile dealership activity has generated revenue from the property.  We will deal with these arguments in reverse order.  Mr. Price started his automobile dealership activity in 1982, before acquiring the property in 1985, and thus the automobile dealership activity could not have been created to derive revenue from petitioners' property.  See Estate of Stangeland v. Commissioner, T.C. Memo. 2010-185, 2010 Tax Ct. Memo LEXIS 221 (stating that land or assets must exist before start of activity).  Turning to petitioners' other argument, petitioners did not begin Rock Ledge until 1993, and it has never shown a profit.  Thus, we find that Rock Ledge is not an effort to derive revenue from the property, either in theory or in fact, because of both the delay in starting the activity and its unprofitable history.  This factor favors respondent.

**[\*36]**           c.           <u>Timing of Formation of Activities</u>

The activities were not formed at the same time.  This factor favors

respondent.

d.           <u>Each Activity's Benefit to the Other Activity</u>

Petitioners argue that the "horse customers" form a "loyal core" of

customers who have purchased multiple vehicles from petitioners' dealerships and

who helped sustain the Chevrolet dealership when it was facing termination of its

agreement by General Motors.  Petitioners also argue that the automobile business

has provided benefits to Rock Ledge in the form of advertising work by Pat

Adelmann, a location where cooled stallion semen could be received, and

provision of shared worker's compensation insurance, health insurance, and

payroll accounting.

Petitioners urge us to follow the holding in <u>Topping v. Commissioner</u>, 2007

Tax Ct. Memo LEXIS 88, which treated the taxpayer's interior design and

equestrian activity as a single activity for purposes of section 183.  The taxpayer in

<u>Topping</u> generated more than 90% of her interior design client base through

equestrian activity contacts.  <u>Id.</u> at \*20.  The Court is not convinced that, in these

cases, the benefits each activity derived from the other were anything more than

incidental.  Taking Mr. Price's estimate as true that "horse customers" have

**[*37]** generated $500,000 per year in sales, that amount is negligible considering that the dealerships' 2012 gross receipts exceeded $96 million. Mr. Price testified that, even in the best years, "horse customers" purchased only 60 to 70 vehicles from his dealerships. Considering that the dealerships average combined wholesale and retail sales of 8,000 vehicles per year, the sales to "horse customers" in good years still amount to less than 1% of all sales. Thus, Rock Ledge and petitioners' automobile dealership activity are not comparable to the activities considered in Topping. The Court also excludes from the definition of "horse customers" the Kanavy family and their business, Trevdan. Timothy Kanavy has known Mr. Price since childhood, and their families had a longstanding relationship before the formation of Rock Ledge. See, e.g., Trupp v. Commissioner, T.C. Memo. 2012-108, 2012 Tax Ct. Memo LEXIS 109, at *23 (finding that taxpayer's major client hired him because of a preexisting relationship and not because of taxpayer's son's equestrian activity). Moreover, the Kanavy family and Trevdan began purchasing vehicles from petitioners in 1982, more than 10 years before Rock Ledge was commenced. Excluding sales to the Kanavy family and Trevdan, the percentage of vehicles purchased by "horse customers" shrinks even more.

**[*38]** Further, the list of "horse customers" was prepared for trial and is self-serving. The sample contracts submitted to corroborate the list include contracts of sales that were clearly not made to anyone involved in Rock Ledge. Moreover, some of the customers would likely have purchased vehicles regardless of any involvement with Rock Ledge through the dealerships' advertising to target demographics, including those in the horse industry. Accordingly, this factor favors respondent.

### e.    Cross-Advertising

Cross-advertising between the activities was minimal. Petitioners submitted one print advertisement that covered both Rock Ledge and RayPriceCars.com, and this advertisement was for 2012, after the years at issue. Rock Ledge's Web site has a button that takes visitors to RayPriceCars.com, but there is no evidence that RayPriceCars.com has any sort of reciprocal button to take visitors to the Rock Ledge Web site. All of the other advertisements that petitioners submitted mentioned only one activity or the other. Petitioners argue that horse shows are themselves a form of advertising and therefore advertising the dealerships at horse shows through T-shirt giveaways and donations of cars is a form of cross-advertising. However, this argument ignores the fact that marketing the dealerships at horse shows could also have been done solely to capture a target

**[*39]** demographic and would not require the existence of Rock Ledge as part of the automobile dealership activity. This is especially true given that the dealerships' advertisements at horse shows made no mention of Rock Ledge. Accordingly, this factor favors respondent.

### f.    Shared Management

Rock Ledge and the automobile dealerships share management only in the form of Mr. Price. This factor favors respondent. See Estate of Stangeland v. Commissioner, 2010 Tax Ct. Memo LEXIS 221, at *26.

### g.    Shared Caretaker

Petitioners argue that they satisfy this factor as "Mr. Price oversaw the assets of both undertakings". Notwithstanding the fact that we find the overlap of only Mr. Price in both undertakings to be insufficient from a shared management standpoint, this factor would be duplicative of the sixth factor if we were to agree with petitioners that Mr. Price's managerial duties also qualify him as a caretaker. Managers and caretakers typically have different roles. The general dictionary definition of a caretaker as relevant here is "one that takes care of the house or land of an owner who may be absent". Webster's Ninth New Collegiate Dictionary 208 (1985). Conversely, the dictionary definition of "manage" as used in the term "manager" as relevant here is: "1: to handle or direct with a degree of

**[\*40]** skill or address: as \* \* \* c: to exercise executive, administrative, and supervisory direction of <~a business>". Id. at 722.

Mr. Price did not function as the caretaker of Rock Ledge. Mr. Price works more than 60 hours per week at the dealerships and thus is absent from the property during those hours. If anyone does qualify as a caretaker of Rock Ledge, it would more appropriately be Ms. Steckel, the barn manager who looked after Rock Ledge's horses and barns daily, rather than Mr. Price. Since Rock Ledge and the dealerships do not share a caretaker, this factor favors respondent.

h.      Shared Accountant

Petitioners argue that Rock Ledge shares an accountant with the dealerships because the same C.P.A., Mr. Murphy, prepared the Schedules F on which Rock Ledge was reported and also prepared tax returns for the dealerships. Respondent asserts that Rock Ledge does not share an accountant with the dealerships since Mr. Murphy never prepared financial statements or independently audited the books and records of Rock Ledge, but Mr. Murphy does prepare balance sheets, income statements, and statements of cashflow for the dealerships.

Since Mr. Murphy had only the limited involvement with Rock Ledge that was required to prepare petitioners' personal income tax returns, we agree that this factor favors respondent.

**[\*41]**              i.        <u>Shared Books and Records</u>

The activities do not share books and records.  This factor favors respondent.

              2.        <u>Section 1.183-1(d)(1), Income Tax Regs., Factors</u>

Petitioner argues that despite not meeting any of the nine foregoing factors, Rock Ledge and the automobile dealership activity are highly interrelated, serve a common business purpose, and are similar undertakings.  The Court disagrees with petitioners' contention that Rock Ledge and the automobile dealership activity share sufficient organizational and economic overlap.  The dealerships were organized as S corporations, whereas Rock Ledge was a sole proprietorship in 2009 and 2010 and operated as a limited liability company in 2011.  <u>See</u> <u>Rabinowitz v. Commissioner</u>, T.C. Memo. 2005-188, 2005 Tax Ct. Memo LEXIS 188, at \*24 (finding that where one activity was an S corporation and the other was operated as a sole proprietorship, the two activities did not have a close organizational relationship).  The activities do not share assets or lease real or personal property from one another.  The activities do not share bank accounts or employees, notwithstanding de minimis work by dealership employees for Rock Ledge at the behest of their boss, Mr. Price.

[*42] Additionally, any economic benefit between the two activities is entirely unidirectional from Rock Ledge to the dealership. Mr. Price may occasionally generate vehicle sales from meeting people through Rock Ledge, but as he is a successful salesman, he is likely to pursue sales opportunities in many situations. There is no evidence that Rock Ledge obtains economic benefit from the dealerships, except for the inclusion of Rock Ledge employees on dealership insurance plans and payroll accounts. Consequently, Rock Ledge and the automobile dealership activity are not sufficiently interconnected under section 1.183-1(d)(1), Income Tax Regs.

The Court also disagrees that the activities were conducted together within the meaning of section 1.183-1(d)(1), Income Tax Regs. Any overlap in the activities, such as receipt of cooled stallion semen at the Honda dealership, was for the convenience of Mr. Price, the CEO of the corporations.

Finally, the activities are wholly dissimilar. Petitioner attempts to overcome this fact by arguing that: (1) both activities involve the sale of expensive personal property; (2) Rock Ledge and the dealerships both sell services related to the products sold; (3) both activities are predominantly headquartered in Pennsylvania; and (4) both activities involve products which are created and sold in the United States. These categories are so broad as to be meaningless.

**[*43]** After reviewing all relevant facts and circumstances, we find that Rock Ledge and petitioners' automobile dealership activity were separate undertakings. We next address whether Rock Ledge qualifies as a for-profit activity under section 183.

B.      Whether Petitioners Conducted Rock Ledge for Profit

To determine whether a taxpayer conducts an activity for profit, section 1.183-2(b), Income Tax Regs., enumerates nine nonexclusive factors to be considered.  The factors are:  (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.  Sec. 1.183-2(b), Income Tax Regs.  No one factor is determinative, and all the facts and circumstances are to be taken into account in determining the existence of a profit objective.  Allen v. Commissioner, 72 T.C. at 34 (citing section 1.183-2(b), Income Tax Regs., Dunn v. Commissioner, 70 T.C. at 720, Jasionowski v. Commissioner, 66 T.C. 312, 319

**[\*44]** (1976), and <u>Benz v. Commissioner</u>, 63 T.C. at 382).  We examine each of these factors in turn.

### 1. Manner in Which the Activity Is Conducted

We begin by examining the manner in which petitioners conducted Rock Ledge.  Facts that may indicate that an activity was engaged in for profit include: (a) carrying on the activity in a businesslike manner, including maintaining complete books and records; (b) carrying on the activity in a manner substantially similar to other activities of the same nature which are profitable; and (c) changing operation methods, adopting new techniques, or abandoning unprofitable methods in a manner consistent with an intent to improve profitability.  Sec. 1.183-2(b)(1), Income Tax Regs.

### a. Businesslike Manner

Petitioners argue they conducted Rock Ledge in a businesslike manner.  As support, they cite Rock Ledge's Web site, business plan, advertising, records such as veterinary calendars and breeding data, maintenance of worker's compensation and health insurance on Rock Ledge employees, paying Rock Ledge employees from an ADP payroll account, use of a price list for Rock Ledge services, and having the same accountant as the dealerships.  Respondent asserts petitioners did not conduct Rock Ledge in a businesslike manner because the books and records

[*45] were inadequate, incorrect, maintained primarily for tax purposes and not to improve profitability, and consistent with conducting a hobby rather than a business.

Some of Rock Ledge's practices are consistent with conducting the activity for profit, whereas others are not. The Web site is characteristic of a business rather than a hobby. Likewise, having a price list with the prices for services is businesslike. However, other Rock Ledge practices are inconsistent with a profit objective, particularly given Mr. Price's business acumen with respect to the dealerships. The business plan is undated and appears to have been created solely for passing muster under section 183, given the inclusion of such aspects as the appreciation of the land as a method of generating income. Rock Ledge did very little advertising in the years at issue; only $1,120 in advertising expenses was reported in tax year 2009, while no advertising expenses were reported for tax years 2010 or 2011.

Maintenance of veterinary calendars and breeding data, by themselves, are consistent with a hobby and do not necessarily indicate a business purpose. See Feldman v. Commissioner, T.C. Memo. 1986-287, 1986 Tax Ct. Memo LEXIS 321, at *19 (citing Golanty v. Commissioner 72, T.C. 411, 430 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981)) (finding that

[*46] keeping pedigree, show, breeding, and veterinary records is as consistent with a hobby as with a business, particularly where the taxpayers did not prepare basic financial records such as profit and loss statements or balance sheets). Petitioners have not submitted any books and records containing projected profit and loss, balance sheets, or budgets. Each piece of evidence petitioners submitted that purports to show expected profits is devoid of any calculations of expenses. For example, Exhibit 202 is an "estimated revenue recap" for 2013 that shows estimated revenues from board and training, hauling, show fees, horse leases, riding lessons, sales commissions, and horse sales. By petitioners' own admission, Exhibit 202 was prepared in December 2013, just before trial. Further, Exhibit 202 is one page, is handwritten, and contains no calculations used to arrive at the numbers given for each category. As an estimate of revenue, Exhibit 202 gives no costs, actual or estimated, for 2013. Additionally, tax year 2013 is not at issue; petitioners submitted no similar documents for tax years 2009-11. Exhibit 118, the handwritten notebook Mr. Price kept at the Stroud Ford location, likewise covers tax years other than those at issue, is handwritten, and contains no reference to expenses.

Petitioners assert they have submitted adequate books and records because "[r]espondent has not raised any issue of substantiation" with respect to the

**[*47]** expenses petitioners claimed.  Substantiation of expenses and maintenance of books and records are distinct issues.  Further, petitioners bear the burden of proof with respect to deductions claimed for expenses.  <u>See</u> sec. 6001.  Petitioners argue that Rock Ledge had the same C.P.A. as the dealerships.  But as previously discussed, even if the same C.P.A. did prepare petitioners' returns with respect to Rock Ledge, it was Mrs. Price who kept the books and records, of Rock Ledge, not Mr. Murphy.  Mr. Murphy did not audit these books and records and he did not prepare financial statements regarding Rock Ledge.

Respondent argues that petitioners' inventory lists are incomplete and full of errors.  In particular, respondent points to one horse, Ryado RL, whose name is absent from the 2010 inventory list but appears on inventory lists for 2009, 2011, 2012, and 2013.  Additionally, both the 2010 and 2011 inventory lists reflect the same horse, Zips Reflection RL, as having been "put down at trainers".  Aside from these errors in the inventory lists, petitioners have not provided to the Court a consistent list of horses owned by Rock Ledge.  For example, petitioners claim to own Evensong AH, which they claim is a daughter of *Aladdinn, and Bey-Rose Gal, an Aristocrat mare.[7]  Neither Evensong AH nor Bey-Rose Gal appears on the

---

[7]An "Aristocrat mare" is a mare that has produced four or more champion offspring.

**[\*48]** 2013 inventory list or Professor Hughes' appraisal report, and it appears Bey-Rose Gal died in 2002. Likewise, petitioners' briefs discuss the pedigrees of \*Werda and Baskarysa, but it does not appear that petitioners owned these horses at the time of trial. Baskarysa's name does not appear on any of the inventory lists submitted to the Court. \*Werda appears on the 2009 and 2010 inventory lists, but the 2010 list indicates that she was given away. In sum, the inventories submitted to the Court were incomplete and some appeared to be incorrect, and they were not kept in a businesslike manner.

In some instances, maintaining workers' compensation insurance and health insurance on employees and paying them from a payroll account could be indicative of businesslike methods. In these cases, however, it appears to the Court that covering Rock Ledge employees under policies maintained for dealership employees was done for the convenience of Mr. Price and to lower the cost of obtaining these policies. Likewise, paying Rock Ledge employees from a common ADP payroll account was done as a matter of convenience and does not show a business purpose. In sum, petitioners did not conduct Rock Ledge in a businesslike manner.

**[\*49]**          b.      <u>Conducting the Activity Similarly to Profitable Activities</u>

Petitioners contend they conducted Rock Ledge in a manner substantially similar to profitable activities of the same nature. For support, they cite the quality of the barn at Rock Ledge, Mr. Price's selection of the broodmare band, their designation of homebred horses with the "RL" suffix, and various services offered by Rock Ledge, including breeding services, horse sales, horse leasing, and riding lessons. Respondent argues that Rock Ledge was not conducted in a manner similar to profitable horse farms. Respondent also argues that petitioners did not conduct Rock Ledge in a manner similar to the automobile dealership activity, but the Court does not find that this is an appropriate comparison under section 1.183-2(b)(1), Income Tax Regs., since this subfactor inquires about similar, rather than dissimilar, activities. In the case of dissimilar activities, we discuss the differences between Rock Ledge and dealership operations in our analysis of section 1.183-2(b)(5). See <u>infra</u> pp. \*66-\*67.

Petitioners argue that the main barn at Rock Ledge is a professional facility that goes far beyond what a hobbyist would require. On one hand, the barn contains some elements that may point to a profit objective, such as a lounge area with a television and a bar for use by customers. On the other hand, the barn's 19 stalls, workrooms, washrooms, and restrooms, although perhaps more than most

[*50] hobbyists would require, are not necessarily out of line with the desires of a serious hobbyist with the funds to construct such a facility.  See Keating v. Commissioner, T.C. Memo. 2007-309, 2007 Tax Ct. Memo LEXIS 313, at *14 (stating that construction of a barn may be consistent with either a hobby or a business).  For the Court to determine that the barn construction was required for Rock Ledge to be conducted in a manner substantially similar to profitable activities of the same nature, we would need to have evidence that other for-profit horse farms require barns like the one in these cases.  Unfortunately, petitioners have not provided any point of comparison on this issue.  Professor Hughes' report states that the barn is "a first class facility, designed for customers and service" but does not reference the basis for his determination, such as other comparable facilities.  Without a reference point, we conclude that the main barn is not evidence that Rock Ledge was conducted in a manner substantially similar to other activities of the same nature which are profitable.

Petitioners cite Mr. Price's selection of elite mares to form the broodmare band as evidence that Rock Ledge is conducted for profit.  Petitioners name several mares ostensibly owned by Rock Ledge as being elite broodmares, including Overlook Galaxina, Bey-Rose Gal, Evensong AH, *Werda, Opalesque VF, Baskarysa, and Pasazz.  The major problem with naming these horses as

[*51] current broodmares at Rock Ledge is that none of them appears to be currently owned by Rock Ledge, and not all of them are even alive. None of the above-named horses appears on the list of horses appraised by Professor Hughes. Overlook Galaxina, Bey-Rose Gal, and Pasazz all died in 2002 or 2003. *Werda was given away in 2010. Evensong AH, Opalesque VF, and Baskarysa's names do not appear on the 2013 inventory list. Petitioners have not named any other horses that supposedly form part of Rock Ledge's broodmare band. Petitioners have not shown, as they claim, that "the higher the quality of the horses used for breeding, the higher the potential sale revenue that can be expected", since no revenue can be expected from horses that are either dead or not owned by petitioners. Evidence of a profit objective is lacking because in the case of some of the horses, petitioners did not own the named mares during the years at issue, and in all cases they do not currently own the named mares.

Petitioners argue that designating homebred horses with the suffix "RL" is consistent with a profit objective. They cite the practice of Ms. Varian of Varian Arabians, who is a top breeder of Western Pleasure horses, and Ventura Farms, which uses the suffix "VF" after a horse's name. The Court accepts that appending a suffix to a horse's name is a businesslike practice. However, the Court also notes that petitioners cited only two breeders who employ this practice

**[\*52]** and provided no evidence with regard to the profitability of either Varian Arabians or Ventura Farms.

Finally, petitioners argue that Rock Ledge offers numerous services that a hobbyist farm would not provide, including breeding services, horse sales, horse leasing, and riding lessons. However, there is no evidence that any of these services were offered during the years at issue. Rock Ledge did not report any income from breeding during the years at issue. Likewise, the evidence does not reflect that any horses were sold during the years at issue. The Court does not find that Rock Ledge currently leases horses or offers riding lessons. The leases submitted were not for the years at issue and appear to have been crafted on the eve of trial. Petitioners offered scant evidence that Rock Ledge currently offers riding lessons, and there is no evidence that riding lessons were offered during the years at issue. The Court may consider events occurring after the years at issue to the extent those events are probative of petitioners' profit objective. See Mathis v. Commissioner, T.C. Memo. 2013-294, at \*8; Myslisz v. Commissioner, T.C. Memo. 1988-206, 1988 Tax Ct. Memo LEXIS 237, at \*23 n.19 (citing Taube v. Commissioner, 88 T.C. 464, 482 (1987)). However, the Court may assign such events less weight than events occurring during the years at issue. See, e.g., Storey v. Commissioner, T.C. Memo. 2012-115, 2012 Tax Ct. Memo LEXIS 114,

**[*53]** at *27 (considering marketing taking place after the years at issue to be unreliable); Carson v. Commissioner, T.C. Memo. 1990-508, 1990 Tax Ct. Memo LEXIS 561, at *14 (finding advertising occurring after the years at issue not to be evidence of businesslike operations during the years at issue).  On balance, the Court concludes that the lack of breeding services, horse sales, horse leasing, and riding lessons during the years at issue points to a lack of profit objective during those years, particularly considering that some of these services were not begun until well after petitioners received notice November 7, 2011 that their 2009 income tax return had been selected for audit.

### c.    Change of Methods

Changing operation methods, adopting new techniques, or abandoning unprofitable methods is consistent with an intent to improve profitability.  Sec. 1.183-2(b)(1), Income Tax Regs.  Petitioners argue they have implemented several changes to improve the profitability of Rock Ledge by replacing Mr. McManus with Mr. and Mrs. Hall and tracking results.  Respondent counters that petitioners have not modified the way in which they operate Rock Ledge in any way that would increase profitability, such as reducing expenses or advertising to generate new income.

**[*54]** Petitioners did seek to improve profitability by hiring new trainers when Mr. McManus did not meet their goals. Respondent argues petitioners must have lacked a profit objective since nine months elapsed between the firing of Mr. McManus and the hiring of Mr. and Mrs. Hall. Petitioners claim that hiring qualified Arabian horse trainers takes time, and Mr. Price carefully selected Mr. and Mrs. Hall after searching for an appropriate replacement for Mr. McManus. We agree with petitioners that nine months is not an unreasonable amount of time for hiring new horse trainers. Consequently, replacing the trainers is evidence that petitioners undertook to change operating methods in a bid to improve profitability.

Petitioners also point to "tracking results". For this, petitioners cite Exhibit 202, the one-page handwritten "estimated revenue recap" for 2013, as evidence that horse sales income and other income has increased. Again, we take notice of the fact that this document makes no mention of expenses. Further, a one-page handwritten document prepared just before trial is hardly evidence that petitioners closely tracked the expenses and income of Rock Ledge. This factor does not support a change in operating methods.

Respondent argues that petitioners have not made any meaningful changes calculated to increase profitability because they have not reduced expenses, in

[*55] contrast to Mr. Price's business philosophy that expense is a key element of any successful business, and they did very little advertising during the years at issue. We agree with respondent that petitioners have not undertaken any efforts to reduce expenses. Additionally, petitioners' advertising expenses were miniscule, particularly given their overall expenses. Petitioners reported only $1,120 of advertising expenses for 2009 and none for 2010 and 2011. Their expenses for those years totaled $219,010, $208,944, and $204,049 for 2009, 2010, and 2011, respectively. See Mills v. Commissioner, T.C. Memo. 1990-432, 1990 Tax Ct. Memo LEXIS 451, at *27 (finding that taxpayers' small amount of advertising showed a lack of profit objective); Boddy v. Commissioner, T.C. Memo. 1984-156, 1984 Tax Ct. Memo LEXIS 514, at *21 (finding that advertising was insubstantial compared to overall cost of taxpayer's horse-breeding operation), aff'd without published opinion, 756 F.2d 884 (11th Cir. 1985). Horse shows may be a method of advertising horses for sale but, without other efforts to advertise, is not consistent with a profit objective. Sanders v. Commissioner, T.C. Memo. 1999-208, 1999 Tax Ct. Memo LEXIS 244, at *25 (citing Dodge v. Commissioner, T.C. Memo. 1998-89, 1998 Tax Ct. Memo LEXIS 89, at *13-*14, aff'd without published opinion, 188 F.3d 507 (6th Cir. 1999)). Thus, petitioners' minimal advertising expenses do not evince a profit objective.

[*56] Aside from replacing Justin McManus with Chris and Nicole Hall, petitioners have changed very little about the operations of Rock Ledge to make it profitable.

Overall, the numerous unbusinesslike practices of Rock Ledge indicate that petitioners did not have a profit objective. Petitioners did not conduct Rock Ledge in a businesslike manner, nor did they conduct it in a manner sufficiently similar to profitable horse activities. Petitioners have also not shown that they made significant changes to improve the profitability of Rock Ledge, such as reducing expenses or advertising to improve sales. This factor favors respondent.

### 2. Expertise of the Taxpayer or His Advisers

Preparation for an activity by extensive study of its accepted business, economic, and scientific practices, or by consultation with experts in the activity, may indicate that the taxpayer has a profit objective where the taxpayer carries on the activity in accordance with such practices. Sec. 1.183-2(b)(2), Income Tax Regs. Without study of the business aspects of an activity, mere knowledge or familiarity with an activity may indicate a hobby rather than a for-profit activity. See Golanty v. Commissioner, 72 T.C. at 432; see also Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), (finding that taxpayers were familiar with mechanics of dog breeding operation but lacked knowledge regarding economics

[*57] of the activity), aff'g T.C. Memo. 1985-523; see also Wilmot v. Commissioner, T.C. Memo. 2011-293, 2011 Tax Ct. Memo LEXIS 295, at *16. Taxpayers need not make a formal study of an activity before commencing operation, but they should undertake a basic investigation of the factors that affect profit. Westbrook v. Commissioner, T.C. Memo. 1993-634, 1993 Tax Ct. Memo LEXIS 655, at*20 (citing Burger v. Commissioner, 809 F.2d 355), aff'd, 68 F.3d 868, 875 (5th Cir. 1995).

Petitioners argue that they have the requisite expertise because (1) Mr. Price grew up breeding and training Arabian horses, (2) they have been recognized as top breeders by Arabian Horse World Magazine, and (3) Mr. Price has consulted with advisers knowledgeable about horse breeding operations, including Carol Skeuse Hart and Leonard and Jean Skeggs.

The mere fact that Mr. Price grew up around horses and has extensive knowledge of horse breeding and training is, by itself, insufficient to show that he has the expertise required for a for-profit activity. See Kahla v. Commissioner, T.C. Memo. 2000-127, 2000 Tax Ct. Memo LEXIS 156, at *18-*19 (finding that taxpayer lacked expertise even though he grew up on his parents' cattle ranch, knew firsthand the basics of raising and breeding cattle, and had consulted with the USDA Soil Conservation Service and State game and wildlife agencies), aff'd,

[*58] 273 F.3d 1096 (5th Cir. 2001); Hillman v. Commissioner, T.C. Memo. 1999-255, 1999 Tax Ct. Memo LEXIS 293, at *24-*25 (same).

Similarly, the fact that petitioners have been recognized as top breeders does not necessarily show a profit objective. Petitioners submitted one article from Arabian Horse World Magazine dated August 16, 2012, that recognizes them as the fifth-best breeder of purebred Western Pleasure horses from 2007-11. The same article also named Prego RL, a horse bred by petitioners, as the fifth-best purebred Western Pleasure horse for 2007-11. Notwithstanding the limited probative value of a lone magazine article, the fact that petitioners have bred some quality horses is not, by itself, indicative of a profit objective. The expertise of raising quality horses is separate from the business expertise required to operate a profitable business. See Golanty v. Commissioner, 72 T.C. at 432.

Petitioners point to various "advisers" as evidence that they have analyzed the business side of Rock Ledge. Mr. Price testified that he discussed "business operations * * *, climate treatment, costs, [and] employment costs" with Ms. Hart, who operates Springwater Farms, and he also copied a contract used by Springwater Farms for use by Rock Ledge. Petitioners presented no evidence on the profitability of Springwater Farms, nor on any of the methods or techniques they might have adopted from Springwater Farms in an effort to make Rock Ledge

**[\*59]** profitable. Mr. Price's testimony regarding his discussions with Ms. Skeuse Hart was self-serving and vague. He did not identify any specific practices she might have advised him on, stating simply that he "ha[s] had and continue[s] to have ongoing conversations with her and her trainers about horses in general or business operations or training, or any number of things horse-related."

Additionally, Mr. Price testified that he was influenced by the success of Mr. and Mrs. Skeggs, friends of his parents who had sold horses for up to $500,000. Petitioners did not present any evidence to confirm that the Skeggses had sold horses for such great value, or if they did, any evidence regarding the net profit of such horse sales. Mr. Price may well have been influenced by the Skeggses' alleged success, but that does not make them his advisers in any way relevant to the inquiry under section 183 of whether he sought guidance from experts in the field.

Petitioners have not shown that they sought professional advice on the business aspects of operating a profitable horse business. This factor favors respondent.

### 3. Time and Effort Expended in the Activity

The fact that a taxpayer devotes much of his or her personal time and effort to carrying on an activity, particularly if the activity does not have substantial

[*60] personal or recreational aspects, may indicate a profit objective. See sec. 1.183-2(b)(3), Income Tax Regs. A taxpayer's withdrawal from his or her occupation to devote energy to the activity may indicate the activity is engaged in for profit. Id. The fact that the taxpayer does not devote significant time and energy to the activity may not prove a lack of profit objective where he or she employs competent and qualified persons to carry on the activity. Id.

Petitioners argue that Mr. Price spends a substantial amount of time on Rock Ledge and therefore a profit objective is indicated. This argument is not supported by the facts. Mr. Price works over 60 hours per week at his dealerships. He has not withdrawn from his occupation as an automobile dealer in order to devote more time and energy to Rock Ledge. Further, to the extent Mr. Price is involved with Rock Ledge, much of his time appears to have been directed toward its more enjoyable aspects, such as attending horse shows. However, petitioners employed a barn manager throughout the years at issue as well as trainers during portions of the years at issue. The barn manager and the trainers are competent and qualified persons, and therefore the fact that Mr. Price did not withdraw from his primary occupation does not weigh against petitioners. See e.g., Pirnia v. Commissioner, T.C. Memo. 1989-627, 1989 Tax Ct. Memo LEXIS 627, at *15-

**[\*61]** \*16; <u>Eisenman v. Commissioner</u>, T.C. Memo. 1988-467, 1988 Tax Ct. Memo LEXIS 492, at \*16-\*17.  This factor is neutral.

4.  <u>Expectation That Assets Used in the Activity May Appreciate in Value</u>

The term "profit" includes appreciation in the value of assets used in the activity.  Thus, a taxpayer may intend to derive a profit from the operation of the activity, even if the operation is not currently profitable, if an overall profit will result when appreciation of the assets used in the activity is realized, since income from the activity together with the appreciation of the assets will exceed expenses of the operation.  Sec. 1.183-2(b)(4), Income Tax Regs.  For purposes of section 1.183-2(b)(4), Income Tax Regs., assets used in the activity may include the land on which the activity is conducted if the holding of the land and the activity are considered to be a single activity under section 1.183-1(d), Income Tax Regs.

Petitioners argue that Rock Ledge is conducted with a profit objective because the horses are very valuable and the property, when sold, will generate income in excess of $1 million.  For reasons discussed below, the Court finds that sale of the horses would not transform Rock Ledge into a profitable activity, and further, the land is not to be considered an asset of Rock Ledge for purposes of analysis under section 1.183-2(b)(4), Income Tax Regs.

[*62]              a.      Value of the Horses

Petitioners argue, on the basis of the appraisal by Professor Hughes, that the value of the horses is $575,000. Mr. Price stated at trial that the top Half-Arabian horses have been sold for as high as $500,000, but petitioners provided no independent evidence with regard to this allegation, and we are not required to accept Mr. Price's statements without corroboration. See Giles v. Commissioner, T.C. Memo. 2005-28, 2005 Tax Ct. Memo LEXIS 29, at *57 (stating that taxpayer provided no evidence on the syndicated value of purebred Arabian stallions). Petitioners argue that there is potential for huge profits because their broodmare band includes Evensong AH, the daughter of *Aladdinn, a $6.3 million horse (as stated only by Mr. Price, also with no independent verification). As previously concluded, the Court does not find that petitioners currently own Evensong AH. Further, the value of the horses as appraised by Professor Hughes is not convincing. Professor Hughes' report is scant in its observations of the differences among the horses; 19 of the 20 reports give the same "good" rating in all 17 conformation categories. Ten of the horses are valued at over $20,000, with one horse, Midnight Magnum, appraised at $75,000. The most expensive horse ever sold by petitioners was Jason EL Jamaal RL for $17,000. To believe that petitioners would suddenly have such increased success in their breeding program

[*63] after 20 consecutive years of losses ignores the reality of past sale as well as petitioners' own business plan, which calls for an average sales price of $15,000 per horse.

Further, there is direct evidence that petitioners did not follow the valuations set forth in Professor Hughes' report. Professor Hughes appraised Ggrand Slam at $15,000 on December 13, 2013. Two weeks later, petitioners sold Ggrand Slam for $8,000. Petitioners claim that the buyer also agreed to buy her next vehicle from one of the dealerships, but this is not memorialized in the contract for the sale of Ggrand Slam. Additionally, any profit from the sale of a vehicle would be attributable to the automobile dealership activity, not to Rock Ledge.

Petitioners' argument that they have unrecognized gain of $575,000 in the herd is premised on Rock Ledge's having a cash basis method of accounting, which would mean that the homebred horses have a zero basis. However, petitioners reported Rock Ledge under the accrual method on Schedule F for each of the years at issue and therefore we cannot agree with petitioners that their basis in the herd is zero. Without adequate information concerning basis, the Court cannot agree with petitioners that the sale of the herd would result in petitioners' realizing gains equal to the value of the herd as appraised by Professor Hughes.

**[*64]** <u>Cf., e.g.</u>, <u>Erickson v. Commissioner</u>, T.C. Memo. 2008-224.  Finally, even if petitioners were able to sell the horses for $575,000, they would recoup less than half of their losses over the period from 2005-12.  Consequently, the value of the horses does not support petitioners' allegation that when sold, Rock Ledge will become profitable.

b.      <u>Value of the Property</u>

Petitioners assert that the unrealized gain in the property exceeds $1 million, and that when sold, the land will make Rock Ledge profitable.  As with the horses, petitioners have not provided adequate information about the basis in the land, except for providing the Court with the original purchase price of $150,000.  Petitioners have extensively improved the land by renovating the farmhouse for use as their principal residence, constructing several barns and sheds on the property, clearing the land, and adding two septic systems and wells.  There is no information about the cost of these improvements.  <u>See</u> <u>Tarutis v. Commissioner</u>, T.C. Memo. 1982-313, 1982 Tax Ct. Memo LEXIS 433, at *12 (stating that Court was unable to determine whether appreciation in value of farm would offset years of substantial losses with no evidence provided as to farm's total cost or taxpayers' basis).

**[\*65]** Under section 1.183-1(d)(1), Income Tax Regs., we analyze the degree of organizational and economic interrelationship of separate undertakings to determine whether they are one activity for purposes of section 183. Where land is purchased or held primarily with the intent to profit from its increase in value and the taxpayer also farms the land, the farming and holding of the land will be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation. Sec. 1.183-1(d), Income Tax Regs. For this purpose, the income from the farming must exceed the deductions attributable to the farming activity which are not directly related to the holding of the land (such as deductions attributable to interest on a mortgage secured by the land, property taxes on the land and improvements, and depreciation of improvements on the land). Id. subpara.

Petitioners clearly fail the requirements of section 1.183-1(d)(1), Income Tax Regs., because, assuming the land was purchased to hold for appreciation, the income from Rock Ledge has never exceeded the relevant deductions. Petitioners attempt to sidestep the characterization in section 1.183-1(d)(1), Income Tax Regs., by arguing that they did not purchase the property to profit from its increase in value; rather, they purchased the property to begin a horse farm. Petitioners thus conclude that the land and Rock Ledge necessarily constitute the same

[*66] activity. However, petitioners' testimony on this point was somewhat contradictory: Mr. Price testified that he bought the property with the intention of operating a horse farm on the property, but he also testified he hoped the property would appreciate.

Considering all of the facts and circumstances, we find that there was no economic or organizational relationship between the land and Rock Ledge. Petitioners purchased the property in 1985 and began using the farmhouse as their principal residence in 1987. Petitioners' personal use of the property is contrary to their assertion that their primary purpose was to begin a horse business. See Betts v. Commissioner, T.C. Memo. 2010-164, 2010 Tax Ct. Memo LEXIS 199, at *27-*28. Petitioners did not begin Rock Ledge until 1993. The years during which petitioners used the property before they began Rock Ledge cannot be considered part of the startup period, a term that by its definition requires that the activity have been started. Had petitioners truly intended to put a horse farm on the property when they bought it, they would have done so within the first few years of purchase. Further, the Court finds that the sale of part of the property in 1997 is evidence that the land was appreciating independently from Rock Ledge and not as a result of it. See Boddy v. Commissioner, 1984 Tax Ct. Memo LEXIS 514, at *22 n.6 ("An unsuccessful farming operation cannot be carried on forever simply

**[\*67]** because the price of land in that general area is rising." (citing <u>Jasionowski v. Commissioner</u>, 66 T.C. at 323)). Consequently, we hold that the property is not to be considered an asset of Rock Ledge. Since the property is not an asset of Rock Ledge, and the value of the herd does not support a finding that the assets are appreciating, this factor weighs in favor of respondent.[8]

### 5. Taxpayer's Success in Similar or Dissimilar Activities

Although an activity is unprofitable, the fact that the taxpayer has previously engaged in similar or dissimilar activities and converted them from unprofitable to profitable may indicate that the current activity is conducted for profit. Sec. 1.183-2(b)(5), Income Tax Regs.

Petitioners argue that Mr. Price's success in operating the automobile dealerships demonstrates his ability to turn unprofitable businesses into profitable enterprises. In particular, petitioners point to Mr. Price's having transformed more than one bankrupt dealership into profitable businesses and his overall growth in car sales from fewer than 100 units per year to in excess of 8,000 vehicles sold per year. Petitioners reason that this factor therefore weighs in their favor. We

---

[8]Even if we were to find that the property is an asset of Rock Ledge, such a finding would not lead to petitioners' conclusion that the unrealized gain in the property is sufficient to offset Rock Ledge's losses since petitioners' basis in the property is unclear and does not provide the Court with adequate information to determine appreciation in value.

[*68] disagree. Although Mr. Price is a successful businessman, it does not appear that he imported many of the core principles of his own business philosophy into Rock Ledge, such as controlling margin, volume, and expense. In particular, petitioners have failed to operate Rock Ledge in a businesslike manner and have not sought to make changes that would reverse their 20-year trend of losses. See Giles v. Commissioner, 2005 Tax Ct. Memo LEXIS 29, at *52-*53 (finding that taxpayer who operated a successful dental practice did not conduct horse activity in a businesslike manner); Dodge v. Commissioner, 1998 Tax Ct. Memo LEXIS 89, at *18 (finding that taxpayers' accounting, business, and legal knowledge was not used in the operation of their horse activity). This factor favors respondent.

6.    History of Income or Loss With Respect to the Activity

Section 1.183-2(b)(6), Income Tax Regs., provides in relevant part:

A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather damages, other involuntary conversions, or depressed market

**[\*69]** conditions, such losses would not be an indication that the activity is not engaged in for profit. \* \* \*

The Court has previously found the startup stage for a horse breeding activity to be between 5 and 10 years. Engdahl v. Commissioner, 72 T.C. 659, 669 (1979); Phillips v. Commissioner, T.C. Memo. 1997-128, 1997 Tax Ct. Memo LEXIS 140, at \*35. Petitioners have not realized a profit from Rock Ledge since it was commenced over 20 years ago in 1993.

Petitioners argue that the sale of part of the property in 1997 made Rock Ledge profitable for that year, but we do not find the property to be an asset of Rock Ledge and thus we do not attribute the gain on that sale to Rock Ledge. Petitioners attribute their lack of profits to the setbacks that Rock Ledge suffered, including the loss of Reflection RL, the spontaneous abortions suffered by multiple mares, and reduced market conditions for Arabian horses during 2009-11. Petitioners claim that the death of Reflection RL resulted not only in the lost value of the horse but also in the loss of his services as a stallion, including the value of offspring he might have sired. Petitioners cite the alleged value of Reflection RL's offspring, including Professor Hughes' appraisals of Rock N Reflection RL at $70,000, Rockette RL at $45,000, Rock N Roan RL at $45,000, and Ryado RL

**[*70]** at $25,000. The record reflects that as of the time of trial, one gelding of Reflection RL, a gelding named Evidence RL, had been sold for $10,000.

Petitioners have not shown that the lost value of Reflection RL's offspring would be sufficient to compensate for the large losses they sustained during 2009, 2010, and 2011. Since Reflection RL's death in late 2009 or early 2010, petitioners have sold only one of his offspring, for $10,000. Consequently, we cannot agree that the losses during those years were attributable to the death of Reflection RL. See, e.g., Carson v. Commissioner, T.C. Memo. 1990-508, 1990 Tax Ct. Memo LEXIS 561, at *18-*19 (stating that Court disagreed that loss of taxpayers' champion breeding dogs resulted in lost expected sales revenue.).

Petitioners' argument regarding lost revenue from the spontaneously aborted foals fails for the same reason as their argument regarding the lost value of Reflection RL's offspring. Petitioners did not sell any horses during the years at issue, and they have not provided any evidence as to the alleged value of the foals lost because of the spontaneous abortions. See id.

Petitioners also argue that conditions of the Arabian horse market, like the car market, were depressed during the years at issue. Petitioners presented no evidence on this issue. Professor Hughes testified that the market conditions during the years at issue were "difficult" and "going through very tough economic

[*71] times".  However, petitioners offered no other evidence to corroborate

Professor Hughes' statements at trial, and the report he submitted did not include

any analysis of the Arabian horse market, either during the years at issue or after.

Additionally, Mr. Price's ability to weather economic downturns is evidenced by

the fact that during 2009-11 his automobile dealerships avoided laying off any

employees and remained profitable despite reduced automobile buying

nationwide.  Consequently, we cannot agree that the economic recession or

conditions within the Arabian horse market during the years at issue were

"unforeseen or fortuitous circumstances" that would explain petitioners' lack of

profit during those years.  This factor favors respondent.

### 7. Amount of Occasional Profits, If Any, Which Are Earned

The amount of profits in relation to the amount of losses incurred, and in

relation to the amount of the taxpayer's investment and the value of the assets used

in the activity, may provide useful criteria in determining the taxpayer's intent.

Sec. 1.183-2(b)(7), Income Tax Regs.  Occasional substantial profit would

generally indicate that an activity is engaged in for profit, where the investment or

losses are comparatively small.  Id.  Additionally, the opportunity to earn a

substantial ultimate profit in a highly speculative venture is ordinarily sufficient to

[*72] indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated. Id.

Rock Ledge has never turned a profit. Despite a 20-year history of losses, petitioners argue that they will realize a substantial profit upon sale of their "high quality horses with excellent bloodlines". For proof, petitioners again cite the syndicated value of *Aladdinn, other stallions supposedly syndicated for millions of dollars, and the presence of Aristocrat mares in the broodmare band. Again, it bears repeating that petitioners have provided no independent evidence of the value of *Aladdinn, and the Court is not required to accept their self-serving statements regarding the value of syndicated stallions. See Giles v. Commissioner, T.C. Memo. 2005-28. Petitioners have also not proven that their broodmare band contains the mares, such as Evensong AH, that would supposedly produce such high-value offspring, particularly when Evensong AH's value as a broodmare has been considerably reduced by chronic degenerative endometritis. Moreover, Professor Hughes appraised the only offspring of Evensong AH currently owned by Rock Ledge at only $15,000. Petitioners have not shown that they can reasonably expect to earn a substantial profit. See McKeever v. Commissioner, T.C. Memo. 2000-288, 2000 Tax Ct. Memo LEXIS 339, at *48 (finding possibility of a substantial profit insufficient to outweigh 11 years of

**[\*73]** losses, particularly given that the taxpayers' horses were not of the quality to generate top prices.). This factor weighs in favor of respondent.

### 8.     Financial Status of the Taxpayer

In relevant part, section 1.183-2(b)(8), Income Tax Regs., provides: "Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved." Taxpayers with substantial income have greater tax incentives to incur large expenditures in a "hobby-type business". Jackson v. Commissioner, 59 T.C. 312, 317 (1972).

Petitioners' gross income from other sources during the years at issue, excluding the losses from Rock Ledge, was substantial, totaling $2,484,136, $1,212,419, and $1,989,222 for 2009, 2010, and 2011, respectively. Cf. Strode v. Commissioner, T.C. Memo. 2012-59, 2012 Tax Ct. Memo LEXIS 55, at \*14 (finding annual income of $137,000 substantial); Rundlett v. Commissioner, T.C. Memo. 2011-229, 2011 Tax Ct. Memo LEXIS 224, at \*21 (finding annual income in excess of $170,000 substantial). Petitioners' income was sufficient to enable a comfortable lifestyle during the years at issue despite the losses from Rock Ledge.

**[*74]** See Dodge v. Commissioner, 1998 Tax Ct. Memo LEXIS 89, at *21.  This factor weighs in favor of respondent.

### 9.  Elements of Personal Pleasure or Recreation

The existence of personal pleasure or recreation relating to the activity may indicate the absence of a profit objective.  See sec. 1.183-2(b)(9), Income Tax Regs.  However, a business will not be turned into a hobby merely because the owner finds it pleasurable; suffering has never been made a prerequisite to deductibility." Jackson v. Commissioner, 59 T.C. at 317.

Mr. Price has been involved with horses from a young age and clearly obtains personal enjoyment from working with horses.  Additionally, petitioners' daughter has a love of horses, and both Mr. Price and his daughter competed in horse shows during the years at issue.  Mr. Price testified that Mrs. Price and their son do not like horses, but neither chose to testify, and we are not required to accept Mr. Price's statements concerning their lack of affection for horses.  Petitioners argue that several of their practices are consistent with a profit motive, such as selling Prego RL after their daughter showed him at a national championship show, and that these practices are inconsistent with a hobby.  The analysis here, however, focuses on personal pleasure or recreation, and it is clear from the record that Mr. Price enjoys horses.  The sale of a horse his daughter

**[*75]** once rode does not cancel out this fact. Petitioners also argue that there is no evidence that the barn or the property was used for entertainment. As with the sale of Prego RL, the fact that petitioners did not entertain at the barn does not disprove Mr. Price's love of horses. This factor favors respondent.

After weighing the nine factors set out in section 1.183-2(b), Income Tax Regs., as applied to the facts and circumstances herein, we find that Rock Ledge was not engaged in for profit within the meaning of section 183. Consequently, petitioners are not entitled to deduct expenses in excess of gross income from Rock Ledge.

## III.    Section 6662(a) Penalty

Respondent determined that petitioners were liable for an accuracy-related penalty pursuant to section 6662(a) for each of the tax years at issue. Section 6662(a) and (b)(1) and (2) imposes a penalty equal to 20% of any portion of an underpayment that is attributable to, inter alia, negligence or disregard of rules or regulations, or any substantial understatement of income tax. "Negligence" is defined as the "failure to make a reasonable attempt to comply with the provisions" of the Internal Revenue Code. An understatement of income tax substantial if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return for the taxable year. Sec. 6662(d)(1)(A).

[*76] The Commissioner bears the burden of production with respect to any penalty, including the accuracy-related penalty. See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). To meet that burden, the Commissioner must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty. Higbee v. Commissioner, 116 T.C. at 446. Respondent determined that petitioners' underpayments were attributable to substantial understatements of income tax of $75,802 and $69,836 for 2009 and 2010, respectively, and we agree. These amounts exceed the "substantial understatement threshold" for tax years 2009 and 2010, and thus respondent has met his burden of production for those years. For tax year 2011, respondent argues that Mr. Price's business acumen should have alerted him to the fact that the tax losses generated by Rock Ledge were "too good to be true" within the meaning of section 1.6662-3(b)(1)(ii), Income Tax Regs., and therefore, petitioners' underpayment for 2011 was attributable to negligence. We disagree that Mr. Price's expertise as a car salesman would alert him to the incorrectness of deductions for Rock Ledge. Business expertise in the field of selling automobiles is not necessarily indicative of knowledge of the proper tax treatment of horse breeding expenses. Accordingly, we find that respondent has not met his burden of production for tax year 2011.

**[*77]** Once the Commissioner has met the burden of production, the burden of proof remains with the taxpayer, including the burden of proving that the penalty is inappropriate because of substantial authority or reasonable cause under section 6664. See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-449. Pursuant to section 6664(c)(1), no penalty shall be imposed under section 6662 with regard to any portion of an underpayment if it can be shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Factors to be considered include the taxpayer's efforts to assess the proper tax liability; the taxpayer's knowledge, education, and experience; and reliance on the advice of a tax professional. Id. A taxpayer's failure to satisfy the requirements of section 183 does not preclude a reasonable cause and good-faith defense to penalties under section 6662(a). See Rodriguez v. Commissioner, T.C. Memo 2013-221, at *57 (citing Connolly v. Commissioner, T.C. Memo. 1994-218, aff'd, 58 F.3d 637 (5th Cir. 1995)); Mathis v. Commissioner, at *19-*20.

Petitioners relied on Mr. Murphy to prepare their returns. Although petitioners directed Mr. Murphy to report Rock Ledge's losses on Schedule F, they

**[*78]** made good-faith efforts to assess their tax liability and discussed these efforts with Mr. Murphy when they hired him as their accountant. Despite falling short of the requirements for a profit objective, petitioners took Rock Ledge seriously. See Mathis v. Commissioner, T.C. Memo. 2013-294. We hold that petitioners had reasonable cause and good faith for their position. Accordingly, we find that they are not liable for any of the accuracy-related penalties.

To reflect the foregoing,

Decisions will be entered under Rule 155.